**James H. McLELLAN, Plaintiff-Appellant,**

v.

**MISSISSIPPI POWER & LIGHT COMPANY, International Brotherhood of Electrical Workers, Local 605 Electrical Workers, Defendants-Appellees.**

No. 73–3226.

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1977.

W. B. Duggins, Jr., Vicksburg, Miss., Dix-on L. Pyles, Jackson, Miss., for plaintiff-appellant.

Sherwood W. Wise, Jackson, Miss., for Miss. Power & Light.

E. Grady Jolly, Jr., Jackson, Miss., for Miss. Power & Light, and others.

Before BROWN, Chief Judge, GEWIN, THORNBERRY *, COLEMAN, GOLD-BERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE, TJOFLAT, and HILL, Circuit Judges.**

TJOFLAT, Circuit Judge:

This case presents the question of whether an employee discharged from private employment solely because he filed a petition in voluntary bankruptcy has a cause of action against his employer and his union under 42 U.S.C. § 1985(3).[1] A divided panel of this court answered in the affirmative.[2] Because of the far-reaching consequences of the holding, we convened an en banc court to consider it.[3]

I

James McLellan had been employed at Mississippi Power & Light Co. (MPL) for five years when, on May 17, 1972, he filed a voluntary petition in bankruptcy. Since this action violated a company rule, he was immediately discharged. He made his grievance known to his union, the International Brotherhood of Electrical Workers (I.B.E.W.), Local 605, but it refused to assist him in seeking reinstatement.

In response, McLellan filed a complaint in the United States District Court for the Southern District of Mississippi. The gist of his rather broadly drawn initial pleading was that MPL had in some manner violated either the Bankruptcy Act[4] or the United States Constitution. The district court granted, with leave to amend, a motion to dismiss for failure to state a claim upon which relief could be granted. McLellan then amended his complaint, joining the union and his local as party defendants and alleging a violation of, *inter alia,* section 1985(3). The district court granted MPL's renewed Rule 12(b)(6) motion, entered final judgment dismissing the amended complaint, and McLellan appealed.

His appeal was determined initially by a panel of this court in February of 1976. Giving McLellan's amended complaint its most liberal construction,[5] the panel, one judge dissenting, found that the requirements of a section 1985(3) conspiracy had been adequately alleged.[6]

II

Section 1985(3) states, in relevant part,

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

---

* Judge Thornberry was a member of the en banc court that heard oral arguments but due to illness did not participate in this decision.

** Because of illness Judge Wisdom did not participate in the hearing or in the consideration of this case.

1. Ku Klux Act of 1871, § 2, 42 U.S.C. § 1985(3) (1970).

2. *McLellan v. Mississippi Power & Light Co.,* 526 F.2d 870 (5th Cir. 1975).

3. Rehearing en banc addressed only the section 1985(3) issue. Accordingly, parts I and II of the panel opinion, dealing with other matters, are not vacated. *See id.* at 872–73.

4. 11 U.S.C. §§ 1 *et seq.* (1970).

5. *See Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

6. For purpose of analysis, we accept the panel's construction of the complaint in that a conspiracy was successfully alleged. We reserve the question, however, as did the panel before us, of whether proof of class-based animus motivating only one conspirator would be sufficient to bring the conspiracy within section 1985(3).

The Supreme Court has recently interpreted this provision in *Griffin v. Breckenridge*.[7] In *Griffin* a group of whites assaulted several black men because they believed, albeit mistakenly, that the blacks were civil rights workers. Griffin and his companions had been traveling on interstate highways before they were stopped and attacked. A unanimous Court held that section 1985(3), when operating under the aegis of the thirteenth amendment and the constitutional right to travel,[8] reaches private conspiracies as well as those performed under color of state law.[9] It then elucidated the four elements a plaintiff must allege to state successfully a cause of action under the section:

(1) the defendants must conspire

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) the defendants must act in furtherance of the object of the conspiracy, whereby

(4) one was (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.[10]

The task before us is to determine whether section 1985(3), as interpreted by the Supreme Court, is applicable to the factual allegations presented in McLellan's amended complaint. In making that determination, we must keep in mind the nature of the conspiratorial objects Congress sought to condemn. Those condemned objects are defined by the statute and listed in *Griffin*'s second element as (1) the purpose to deprive one of the equal protection of the laws and (2) the purpose to deprive one of equal privileges and immunities under the laws.

In examining the amended complaint, it is important first to observe what McLellan does *not* allege. He does not allege a class action on behalf of all MPL employees. Neither does he seek to enjoin the enforcement of MPL's policy to discharge all employees who file voluntary bankruptcy petitions.[11] More significantly, McLellan does not allege a conspiracy to deprive him of any privilege or immunity.[12] McLellan's pleadings show, and it is conceded in this appeal, that he actually did avail himself of the statutory right to file in bankruptcy.[13]

7. 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

8. The Constitutional right to travel is "among the rights and privileges of National citizenship," *Twining v. New Jersey*, 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97 (1908), and finds its base not only in the fourteenth amendment, but in the Constitution as a whole. *Griffin v. Breckenridge*, 403 U.S. at 105, 91 S.Ct. 1790; *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

9. 403 U.S. at 101, 91 S.Ct. 1790. The Court held, "It is thus evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies." The justices, however, were careful to avoid basing section 1985(3)'s coverage in this case on the fourteenth amendment. *See id.* at 107, 91 S.Ct. at 1801: "[T]he allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment." Neither do the allegations of the complaint before us present this issue.

10. *Id.* at 102–03, 91 S.Ct. 1790.

11. This circuit has held that injunctive relief may be claimed under section 1985(3). *Mizell v. North Broward Hosp. Dist.*, 427 F.2d 468 (5th Cir. 1970).

12. We leave to one side at this time the fact that the term "privileges and immunities" has received a very limited construction. *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873).

13. McLellan did complain that MPL, by discharging him on account of his utilization of the Bankruptcy Act, has "deprived him of a federal right provided by Congress . . . ." Record at 14. His allegations are less than clear. If he means to imply that the federal right deprived was the right to file in bankruptcy, that proposition is clearly refuted by other statements made in his complaint. If he means to imply that he has a federal right not to be discharged by his private employer on account of his filing, that proposition is disposed of *infra*. In sum, McLellan has not alleged a conspiracy to deprive him of a privilege or immunity, nor has he alleged that he was in fact deprived of one.

Consequently, we shall not undertake to determine what action the deprivation of equal privileges and immunities entails. Rather, we shall concentrate upon what constitutes the deprivation of the equal protection of the laws.

As we commence this narrowed inquiry, we observe this caveat: In any conspiracy case we are likely to find that the object of the conspiracy is best identified by the acts done in furtherance of that conspiracy. This case is no exception. Even so, our primary focus will remain upon the *object* of the conspiracy alleged by McLellan, that is, upon the existence *vel non* of the second element of a section 1985(3) cause of action. We turn, then, to a discussion of that element.

### III

■ We note at the outset the *Griffin* Court's serious concern over the broad facial sweep of section 1985(3). The Court found the means to avoid a literal interpretation of the statute by giving the second element a restricted construction. As the Court reasoned,

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment [incorporated into the section]. . . .
> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim

at a deprivation of the equal enjoyment of rights secured by the law to all.[14]

It was the presence of the word "equal" which allowed the Court to limit the application of the section. By focusing on that word, the justices discerned that the purpose to deprive another of the *equal* protection of the laws must be class-based.

■ It is evident that the Court did not intend the above language to be a total elaboration of the second element, however. As we shall see in the next subsection, the Court raised a correlative question which must also be addressed: How do private individuals deprive another person of the *protection* of the laws?[15] To satisfy *Griffin*'s second requirement there must be both the private deprivation of the enjoyment of the laws and a class-based, discriminatory motivation. Together, the two amount to a private denial of the equal protection of the laws.

Consequently, in exploring whether a conspiracy has been formed to abridge the equal protection of the laws, our task is twofold. First, we must determine what type of private action deprives one of the protection of the laws. Second, we must examine more carefully the requirement that there be some kind of class-based discrimination.

### A. *What Private Action Constitutes a Deprivation of the Protection of the Laws?*

The panel majority did not undertake to discern what type of private action deprives another of the protection of the laws. Instead, it seemed to suggest that once it is alleged that the plaintiff's right to file a voluntary petition in bankruptcy is in some way burdened or infringed, the analysis ends and a cause of action has been stated under section 1985(3).[16] We reject such an

14. *Id.* at 102, 91 S.Ct. at 1798 (emphasis in original) (footnotes omitted).

15. *See id.* at 97, 91 S.Ct. 1790. We do not mean to indicate, of course, that section 1985(3) applies only to private conspiracies. In this case, however, as in *Griffin,* no state action

has been successfully asserted. *See* 526 F.2d at 872.

16. We have already pointed out, of course, that McLellan did in fact file in bankruptcy, and no allegation has been made that the defendants have prevented him from receiving the full ben-

oversimplified approach and potentially boundless interpretation of the statute.

The Supreme Court in *Griffin* did not concentrate on exactly what constitutes a private deprivation of the protection of the laws. Indeed, Justice Stewart admitted that a century of fourteenth amendment adjudication, which has centered on *state* action, has "made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by *private persons*."[17] Nevertheless, the Court held that the complaint in *Griffin* sufficiently alleged that by stopping, threatening and assaulting the plaintiffs, the defendants had deprived them of their right to the equal enjoyment of the laws.[18]

■ For assistance in determining what a private deprivation of the enjoyment of legal rights entails, we turn to a passage in *United States v. Harris*[19] which was cited by the *Griffin* Court:[20]

A private person cannot make constitutions or laws, nor can he with authority construe them, nor can he administer or execute them. The only way, therefore, in which one private person can deprive another of the equal protection of the laws is by the commission of some offence against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder.[21]

■ The Court through this passage is making clear that the inquiry must initially concentrate on the legality of the defendants' activity apart from section 1985(3). If the object of the defendants' conspiracy did not include a violation of some law (independent of section 1985(3) itself) which protects the plaintiff, the conspiracy could not have deprived the plaintiff of the "protection of the laws". Put more simply, there can only be a deprivation of the rights of a plaintiff when the action of the defendants is *otherwise* illegal. If the defendants have not conspired to act contrary to law, an object of a section 1985(3) conspiracy has not been made out and the section is inoperable, regardless of whether the legal rights of the plaintiff are somehow affected.[22] On

---

efit of the Bankruptcy Act. See note 13 *supra* and accompanying test.

17. 403 U.S. at 97, 91 S.Ct. at 1796 (emphasis added).

18. *Id.* at 103, 91 S.Ct. 1790.

19. 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883).

20. *See* 403 U.S. at 97, 91 S.Ct. 1790. The Supreme Court in *Harris* struck down the criminal counterpart to section 1985(3) as unconstitutional because it swept too broadly in proscribing purely private conduct. *Harris* read the criminal statute as outlawing a conspiracy by two white citizens to deprive another free white citizen of a right accorded by the law of the state to all classes of persons. 106 U.S. at 641, 1 S.Ct. 601. The Court thought it clear that such a law could not be authorized by the thirteenth amendment, "the amendment which simply prohibits slavery and involuntary servitude." *Id.*

The *Griffin* Court avoided the unconstitutional overbreadth problem discerned in *Harris* by observing that *Harris* followed a severability rule that required invalidation of an entire statute if any part of it was unconstitutionally overbroad. 403 U.S. at 104, 91 S.Ct. 1790. Under *United States v. Raines,* 362 U.S. 17, 20–24, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), all possible applications of a statute do not have to be constitutional in order to uphold it in a specific case.

21. 106 U.S. at 643, 1 S.Ct. at 612. Some might suggest that the quoted language was dicta in *Harris.* This is not the case. It has long been settled that *all* alternative rationales for a given result have precedential value. "It does not make a reason given for a conclusion in a case *obiter dictum,* because it is only one of two reasons for the same conclusion." *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 340, 48 S.Ct. 194, 196, 72 L.Ed. 303 (1928). *See also Massachusetts v. United States,* 333 U.S. 611, 623, 68 S.Ct. 747, 92 L.Ed. 968 (1948); *United States v. Title Ins. & Trust Co.,* 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924); *Florida Cent. R. R. v. Schutte,* 103 U.S. 118, 143, 26 L.Ed. 327 (1880). In any event, a discussion of whether the passage is dicta or not is largely academic. The important point is that the *Griffin* Court used the passage to illustrate that a deprivation of protection of the laws is not necessarily inflicted by the state. 403 U.S. at 97, 91 S.Ct. 1790.

22. It should be pointed out that there is some controversy over whether section 1985(3) is strictly remedial in nature or whether it also grants substantive rights against private persons for interference with the exercise of certain constitutional rights otherwise guaranteed

the other hand, if the defendants have indeed conspired to act contrary to law, the inquiry shifts to whether such conduct was motivated by a class-based bias.[23]

*Griffin* fully squares with our analysis. The *Griffin* petitioners had indeed alleged that the defendants' conspiracy comprehended an intent to violate the law independent of section 1985(3).[24] They alleged that the defendants "wilfully and maliciously conspired, planned, and agreed to block the passage of [their] automobile upon the public highways, to stop and detain them and to assault, beat and injure them with deadly weapons."[25] The object of this alleged conspiracy clearly encompassed violations of both the civil and criminal laws of Mississippi.[26] The defendants were also alleged to have engaged in the unlawful conduct

they conspired to commit.[27] Since the petitioners were thereby "injured in [their] person[s] or property," they stated a cause of action under section 1985(3).[28] But it was the purpose to commit an independent violation of the law and the attainment of that goal which triggered the application of the Ku Klux Act.

■ That the failure to allege a conspiracy to effectuate an independent violation of the law defeats a section 1985(3) cause of action is illustrated by the Ninth Circuit decision of *Lopez v. Arrowhead Ranches.*[29] There the plaintiffs, citizens and legally admitted alien farm workers, alleged that they were victimized by a conspiracy between farm owners and illegal alien farm workers. It was alleged that, because the owners hired illegal workers, the plaintiffs

23. In other words, was the conduct a deprivation of the plaintiff's *equal* protection or *equal* privileges and immunities of the laws. *See* 403 U.S. at 102, 91 S.Ct. 1790. This requirement will be discussed in the next subsection.

24. The Court pointed out that it was dealing with "*tortious*, conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798 (emphasis supplied). *See also Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), where the Court demonstrated in some detail that the actions of the defendants were both civilly and criminally actionable under the laws of California. *Id.* at 655, 71 S.Ct. 937.

25. 403 U.S. at 90, 91 S.Ct. at 1792, quoting the petitioners' complaint.

26. *See, e. g.*, Miss.Code of 1942, § 2013, *now codified at* Miss.Code Ann. § 97–3–11 (criminal liability for assault and battery for intentionally pointing or aiming a firearm at another). *See generally* W. Prosser, Law of Torts §§ 9–10 (assault and battery), 11 (false imprisonment), 12 (infliction of mental distress) (4th ed. 1971).

27. 403 U.S. at 90–91, 91 S.Ct. 1790.

28. *Id.* at 103, 91 S.Ct. 1790. In *Griffin*, of course, the defendants also deprived the petitioners of a privilege and immunity, the right to travel.ˌ Thus, the petitioners alleged both 4(a) and 4(b) injuries. *See id.* at 106, 91 S.Ct. 1790.

29. 523 F.2d 924 (9th Cir. 1975).

against state infringement, such as, for example, the first amendment freedoms. *See* Note, *Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments*, 74 Colum.L.Rev. 449, 497–500 (1974) ("section 1985(3) should be viewed as merely remedial in scope, providing an additional remedy for pre-existing rights as opposed to creating new federal rights"); Note, *The Supreme Court, 1970 Term*, 85 Harv.L.Rev. 40, 99–100 (1971). *See also Lopez v. Arrowhead Ranches*, 523 F.2d 924, 927 n.3 (9th Cir. 1975). *See generally United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875); *Meachum v. Fano*, —— U.S. ——, 96 S.Ct. 2532, 2540–41, 50 L.Ed.2d —— (1976) (Stevens, J., dissenting). The circuit courts have divided over this matter. *Compare Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir.), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972); *with Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (en banc). We, however, do not have to reach this issue. The Bankruptcy Clause of the Constitution is not written as a guarantee to individuals that their rights will not be impaired by Congress, the states, or private parties. It neither recognizes nor grants individual rights. It simply states, "The Congress shall have Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S.Const. art. I, § 8. It is beyond cavil that Congress did not intend for section 1985(3) to supply substantive relief on the basis of this constitutional provision alone. *See generally United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973).

were displaced from their jobs and unable to secure work. The court, even after assuming *arguendo* a class-based animus,[30] found no section 1985(3) claim to have been stated since the plaintiffs had

> no legal right or entitlement either to be hired by the private employers, or to be free of discrimination on the basis of alienage when seeking private employment. . . . Having no legal right *per se* to be free of the discrimination, the conspiracy . . . is not *per se* actionable under section 1985(3).[31]

Although stated in terms of the legal rights of the plaintiffs, it is clear that the Ninth Circuit's thrust was that the defendants' conduct was not violative of any law. Since it was not illegal for the farm owners to discriminate on the basis of alienage, section 1985(3) offered the plaintiffs no redress.

It is true that courts often, and quite understandably, speak in terms of the plaintiff's legal rights being abused. This does indeed occur in every successful section 1985(3) action. But the legal right referred to in those instances is the right of every person not to be victimized by another's *illegal* behavior. Section 1985(3) redresses deprivations of the protection of the laws, and one is only deprived of the protection of the laws when the laws themselves have been violated.

No one has the absolute right to complain of every instance in which the action of others infringes upon his own behavior. It is only when that action is unlawful that an individual has legal cause to complain of his injury. Consequently, given the remedial nature of section 1985(3),[32] we think it entirely clear that the statute was not designed to redress *every* interference with one's behavior, even when that behavior is the exercise of what we describe as a "fundamental right".[33] Instead, we are persuaded that the object of a section 1985(3) conspiracy must be to deprive another of the enjoyment of legal rights by independently unlawful conduct.[34]

**30.** *Id.* at 927.

**31.** *Id.* *See also Place v. Shepherd*, 446 F.2d 1239, 1246 (6th Cir. 1971); *Weiland v. Byrne*, 392 F.Supp. 21 (N.D.Ill.1975). In *Lopez* the plaintiffs also alleged that the hiring of illegal aliens forced all farm workers to work at reduced wages and under substandard conditions. Since the wage and hour laws do protect workers, *i. e.*, since employers are required to pay certain wages and meet certain conditions, the court next analyzed whether the plaintiffs had adequately alleged class-based animus. The per curiam panel held that they had not. Noting that the class deprived included both legal and illegal farm workers, the court continued, "[I]t seems to us a necessary corollary that the class animus alleged be consistent with the deprivation of rights alleged. Here it is not. . . . Under *Griffin* we think the class status providing the motivating animus must be created by a fact other than possession of the right deprived . . . ." 523 F.2d at 928.

**32.** It might be posited that in requiring the object of a section 1985(3) conspiracy to include an independent violation of the law, we make the section superfluous. But our interpretation of the statute does not make it superfluous any more than any other remedial statute is so. Many statutes, most notably criminal ones, prohibit activity but provide no finan-

cial recompense to victims. Section 1985(3) serves partially to correct such a situation.

**33.** A contrary interpretation on this point would ignore the *Griffin* Court's concern not to have section 1985(3) become a "general federal tort law." 403 U.S. at 102, 91 S.Ct. 1790. If the panel's reading were accepted, a person would be liable merely for placing any sort of obstacle in the path of someone's equal enjoyment of legal rights. That liability would far exceed any state's common law or legislative enactments. Put more simply, while it may be true, as one commentator has suggested, that *Griffin* has in fact federalized state tort law where racial motivation is involved, at least there must be a tort before section 1985(3) may be utilized. *See* Note, *The Supreme Court, 1970 Term, supra* note 22 at 99. *See also Senn v. Tile Layers Protective Union*, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229 (1937), where the constitutionality of lawful picketing was challenged under the equal protection clause when it caused the picketed employer economic injury. Justice Brandeis remarked succinctly for the Court, "One has no constitutional right to a 'remedy' against the lawful conduct of another." *Id.* at 483, 57 S.Ct. at 864.

**34.** Our reading of the statute is fully supported by its statutory history. One of the major purposes of the Ku Klux Act, if not *the* major purpose, was "to provide a federal remedy

### B. *What Type Of Class-Based Motivation Does Section 1985(3) Encompass?*

 Our analysis in this subsection centers on the following sentence from the *Griffin* opinion: "The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."[35] From this statement, only two assertions can be made with certainty. First, class-based bias must be alleged.[36] Second, racial discrimination is encompassed by the statute.

The Court specifically reserved the question of "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable" under section 1985(3).[37] When faced by this issue, some lower courts since *Griffin* have indeed

held that the statute appropriately addresses class-based motivation other than race. Discrimination against supporters of a political candidate[38] and against women[39] has been held actionable.

At the same time, the lower courts have indicated that section 1985(3) will not be extended to every class which the artful pleader can contrive. This circuit has rejected the class of "those who have been put on an employers' blacklist because they have filed workmen's compensation claims."[40] Other "classes" meeting a similar fate include "doctors discriminated against because they have testified adversely to their brethren in malpractice cases,"[41] "non-white opponents of racism,"[42] "disrupters of university operations for social or political reasons,"[43] and "those whose families have been disrupted by a particular religious cult."[44] More readily identifiable

---

where the state remedy, though adequate in theory, was not available in practice." *Monroe v. Pape*, 365 U.S. 167, 174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492 (1961).

We also draw support for our reading of the statute from the very nature of a civil conspiracy. In a common law tort conspiracy, unlike a criminal conspiracy, a mere combination or agreement to commit a tort is not in itself actionable. Rather, some act *which is itself a tort* must be taken in furtherance of the object of the conspiracy. *See generally* W. Prosser, *supra* note 26, § 46; Burdick, *Conspiracy as a Crime and as a Tort*, 7 Colum.L.Rev. 229 (1907). Section 1985(3), requiring as it does an act in furtherance of the object of the conspiracy and an injury to the plaintiff, closely tracks the elements of a common law conspiracy to commit a tort. By way of comparison, note its criminal counterpart which was struck down in *Harris*. Rev.Stat. § 5519, *quoted in* 106 U.S. at 632, 1 S.Ct. 601. Neither an act in furtherance of the object of the conspiracy nor an injury was required to be demonstrated.

35. 403 U.S. at 102, 91 S.Ct. at 1798 (emphasis in original).

36. *O'Neill v. Grayson County War Memorial Hosp.*, 472 F.2d 1140, 1145 (6th Cir. 1973); *Hughes v. Ranger Fuel Corp.*, 467 F.2d 6, 10 (4th Cir. 1972).

37. 403 U.S. at 102 n. 9, 91 S.Ct. at 1798.

38. *Glasson v. Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46

L.Ed.2d 258 (1975); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973). *But see Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974) (absent state involvement, section 1985(3) does not redress employee discharge due to Ku Klux Klan membership).

39. *Weise v. Syracuse Univ.*, 522 F.2d 397 (2d Cir. 1975); *Reichardt v. Payne*, 396 F.Supp. 1010 (N.D.Cal.1975); *Pendrell v. Chatham College*, 370 F.Supp. 494 (W.D.Pa.1974); *Stern v. Massachusetts Life Ins. Co.*, 365 F.Supp. 433 (E.D.Pa.1973). *But see Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir.), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (per Stevens, J.) (no source of constitutional power for section 1985(3) to redress sex discrimination).

40. *Jacobson v. Industrial Foundation of the Permian Basin*, 456 F.2d 258 (5th Cir. 1972).

41. *Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973).

42. *Furumoto v. Lyman*, 362 F.Supp. 1267, 1286 (N.D.Cal.1973).

43. *Id.*

44. *Smith v. Armstrong*, 396 F.Supp. 753 (N.D. Tex.), *aff'd without opinion*, 524 F.2d 1231 (5th Cir. 1975).

classes have also been rejected, such as newspaper dealers [45] and policemen.[46]

■ This circuit has not heretofore found it necessary to decide whether Congress intended that *only* racial bias would activate section 1985(3). Due to our disposition of this case, we still reserve that question. We remain mindful, however, of the Supreme Court's evident concern in *Griffin* over the broad literal sweep of the statute. That concern dictates the exercise of restraint when a court is confronted with class-based discrimination grounded in a non-racial animus.[47]

## IV

We have analyzed in some detail the nature of a section 1985(3) conspiracy to deny the equal protection of the laws. Now we shall examine McLellan's amended complaint to determine whether it states a claim under the section.

### A. *The Protection of the Laws.*

■ Our analysis has established that it is only when the conspirators seek to achieve their objective by independently

unlawful means that a section 1985(3) claim can be maintained. In this case it is alleged that the objective was to sever McLellan's employment relationship with MPL because he filed in bankruptcy. Our inquiry, then, is whether it was unlawful to terminate his employment on those grounds.

We find no law which restrains MPL from firing an employee because he has filed a petition in voluntary bankruptcy.[48] No statutory provision shields a bankrupt from later economic consequences visited upon him by private individuals, whether acting alone or in concert. A thorough examination of the Bankruptcy Act and its legislative history discloses no explicit provision or intent to prohibit discriminatory action against an individual on the basis of his declaring bankruptcy.[49] In addition, no such Congressional intent can be reasonably inferred from the statute as it is now enacted.[50] Nor can such a right be legitimately implied from the Constitution's Bankruptcy Clause itself. As has been pointed out,[51] that empowering provision speaks only in discretionary terms and does not afford any individual a right which Congress has not specifically legislated.[52]

45. *Arnold v. Tiffany*, 487 F.2d 216 (9th Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

46. *Taylor v. Nichols*, 409 F.Supp. 927 (D.Kan. 1976).

47. The *Griffin* Court intended to give full effect to the congressional purpose. 403 U.S. at 102, 91 S.Ct. 1790. That purpose is partly evidenced in the title of the Act itself: "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." 17 Stat. 13 (1871). It has been frequently remarked that it was passed to implement all three Civil War Amendments. *See, e. g., Byrd v. Sexton*, 277 F.2d 418, 426 (8th Cir.), *cert. denied*, 364 U.S. 818, 81 S.Ct. 49, 5 L.Ed.2d 48 (1960); *Bomar v. Bogart*, 159 F.2d 338 (2d Cir. 1947); *Love v. Chandler*, 124 F.2d 785, 786 (8th Cir. 1942); *Koch v. Zuieback*, 194 F.Supp. 651 (S.D.Cal. 1961), *aff'd*, 316 F.2d 1 (9th Cir. 1963); C. Antieau, Federal Civil Rights Acts § 93 (1971).

48. Of course, discharge from employment is a field which Congress has seen fit to regulate in some instances. *See, e. g.*, Civil Rights Act of 1964, §§ 703(a) & 704(a), 42 U.S.C. §§ 2000e–2(a) & 2000e–3(a) (1970). For cases where

section 1985(3) actions have been predicated on violations of these Civil Rights Act provisions, see *Weise v. Syracuse Univ.*, 522 F.2d 397 (2d Cir. 1975); and *Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971).

49. *See generally* Report of the Comm'n on Bankruptcy Laws of the U.S., H.R.Doc.No.137, 93d Cong., 1st Sess. (1973).

50. *See generally* 2A C. Sands, Sutherland Statutory Construction §§ 55.01–.03 (1973).

51. See note 22 *supra*.

52. *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), makes clear that there is no fundamental right even to file in bankruptcy: "We see no fundamental interest that is gained or lost depending on the availability of a discharge in bankruptcy." *Id.* at 445, 93 S.Ct. at 638. The Court reiterated, "There is no constitutional right to obtain a discharge of one's debts in bankruptcy." *Id.* at 446, 93 S.Ct. at 638. Next, looking to the discretionary nature of the Bankruptcy Clause, the Court held that the "mere fact that Congress has delegated to the District Court supervision over the proceedings by which a petition for discharge

This is not to say that Congress and others have been unmindful of discrimination practiced against bankrupts.[53] Both of the proposed new Bankruptcy Acts—that drafted by the Commission on the Bankruptcy Laws of the United States [54] and that by the National Conference of Bankruptcy Judges [55]—have identical section 4–508's:

A person shall not be subjected to discriminatory treatment because he, or any person with whom he is or has been associated, is or has been a debtor or has failed to pay a debt discharged in a case under this title.[56]

■ It would be inappropriate for us here to resolve whether McLellan would have been protected by this proposed provision had it been law at the time of his firing. Our intent is merely to show that

Congress is only now considering what protection, if any, a bankrupt should have from discriminatory treatment. No statutory protection has been afforded in the past and none presently shelters this unfortunate class.[57]

That no federal statute shields bankrupts does not answer the question of whether an applicable state law has been violated in this case. Turning again to McLellan's amended complaint, we find that he does not attempt to enlist the aid of any substantive state statutory provision.[58] At the most, McLellan endeavors to enforce a private contract right.[59] McLellan alleges that he "was employed for a fixed term and could not be discharged sooner without sufficient cause," and that the company rule was unreasonable and in violation of his contract.[60]

is processed does not convert a statutory benefit into a constitutional right of access to a court." *Id.* at 447, 93 S.Ct. at 639.

**53.** Congress has recently considered the problems of the pressured debtor in hearings on the Consumer Credit Protection Act of 1968. The House Banking and Currency Committee reported that "the garnishment of wages is frequently an essential element in predatory extension of credit resulting in a disruption of employment . . . ." H.R.Rep.No.1040, 90th Cong., 1st Sess., *reported in* [1968] U.S. Code Cong. & Ad.News, pp. 1962, 1977.

**54.** H.R. 31, 94th Cong., 2d Sess. (1976).

**55.** H.R. 32, 94th Cong., 2d Sess. (1976).

**56.** The comment to the proposed section 4–508 reads as follows:

New. The use of the word "person" is intended to cover corporations as well as natural persons. The section is intended to codify the principle of *Perez v. Campbell* that the fresh start afforded by the Bankruptcy Act must not be impaired by State laws subverting that start. However, the statutory language is very broad, seeming to prohibit consideration by a private loan company of a debtor's past bankruptcy in deciding whether to extend new credit.

Also note the proposed section 4–508 in the Bankruptcy Act of the National Bankruptcy Conference, reprinted at *Hearings on H.R. 31 & 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary,* 94th Cong., 1st & 2d Sess., appendix, at 357 (1975 & 1976). One of the suggested amendments by the Conference is to limit section 4–508 to state action.

**57.** *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), is of no help to McLellan. In *Perez* a state statute which provided that a bankruptcy discharge did not erase a judgment against a negligent automobile driver was struck down under the Supremacy Clause, U.S.Const. art. VI, cl. 2. Here, of course, purely private action is involved.

**58.** McLellan does claim to be entitled to relief under section 5335 of the Mississippi Code of 1942, which is now codified at Miss.Code Ann. § 79–1–9. That provision reads, "Any corporation doing business in this state shall be liable to a penalty of two hundred fifty dollars for every *unlawful* interference with the social, civil, or political rights of any of its agents or employees . . . ." (emphasis added). Obviously, this statute, similarly to section 1985(3), does not help us in determining in the first instance whether the interference has been unlawful.

**59.** As we have hinted before, McLellan's amended complaint is not the quintessence of pellucidity. It is not clear from his allegations whether he has a formal, individual contract with MPL or whether his claimed contract of employment is the union's collective bargaining agreement. No contract of either type was appended to the amended complaint.

**60.** McLellan's amended complaint suggests, in addition, a breach of the duty of fair representation on the part of his union and local, although he did not explicitly allege a violation of any federal labor law. *See* Record at 13–14. McLellan identifies the animus motivating this breach as his refusal "to remain a member of

McLellan faces two obstacles, however, in his attempt to satisfy *Griffin*'s second element by alleging an intent to breach a private contract. The first barrier was erected by the district court. Faced with McLellan's allegations, the district court in its order granting MPL's motion to dismiss for failure to state a claim found that the company rule of discharging employees if they filed in bankruptcy was "well known and well established"[61] and that "[n]o breach of contract [was] presented by this claim."[62] Although the district court rendered its opinion and order after briefing and oral argument, we are somewhat hesitant to rest our decision upon these findings. McLellan's contract of employment is not a part of the record in this case; moreover, we are not informed by the order and the record is silent as to what stipulations, if any, were made by the parties. More importantly, the district court did not explicitly treat MPL's motion as a motion for summary judgment.[63] Thus, the trial court's disposition of this matter does not lend itself to definitive treatment on our part.

The second obstacle confronting McLellan is somewhat more formidable. We find it less than clear that one who violates the unique, individual contract rights of another has deprived him of the protection of the laws as *Griffin* construed that phrase. McLellan does not allege that the defendants contemplated depriving him of the operation of any state law—substantive or procedural—available to anyone seeking, as he is, the enforcement of contract rights. In other words, we doubt whether McLellan has alleged a conspiracy to deprive him of "rights secured by the law to all."[64] Even ignoring the fact that the statute was enacted by a Congress predominately concerned with the violent activity of a vindictive Ku Klux Klan,[65] one could cogently argue that Congress did not intend for section 1985(3), tracking as it does the elements of a tort conspiracy,[66] to redress private contract rights.[67] At any rate, we need not resolve this issue, since we find that the class-based discrimination requisite to a claim under the statute is not present in this case.

B. *Class-Based Animus.*

In *Griffin* the Supreme Court was presented with conduct "so close to the core of the coverage intended by Congress" that it found it "hard to conceive of wholly private conduct that would come within the statute" if the conduct before it did not.[68] By contrast, in this case we are presented

---

Local 605 and I.B.E.W." *Id.* at 13. This is facially inconsistent with his charge that the invidious discrimination in this case is against bankrupts. Moreover, such a motivating animus against him as a former union member is not class-based. *See Jacobson v. Industrial Foundation of the Permian Basin,* 456 F.2d 259 (5th Cir. 1972). These allegations clearly fail as a section 1985(3) claim.

**61.** Record at 24.

**62.** *Id.* at 28.

**63.** The pertinent part of Federal Rule of Civil Procedure 12(b) states,

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materi-

al made pertinent to such a motion by Rule 56.

**64.** *Griffin v. Breckenridge,* 403 U.S. at 106, 91 S.Ct. at 1798. *See also United States v. Harris,* 106 U.S. at 641, 1 S.Ct. 601.

**65.** *See generally Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**66.** See note 34 *supra.*

**67.** The *Griffin* Court's concern that the statute not redress every common law tort would seem equally appropriate in the context of the enforcement of private contract rights. *See* 403 U.S. at 102, 91 S.Ct. at 1790. This same concern has led a panel of this court to remark recently, "Section 1985(3) was [not] designed . . . to serve as a general federal tort law that would permit a suit for fraud or breach of contract . . . ." *Jackson v. Cox,* 540 F.2d 209, 210 (5th Cir. 1976).

**68.** 403 U.S. at 103, 91 S.Ct. at 1799.

with conduct far from the core of the coverage intended by Congress. Indeed, we find it hard, if not impossible, to conceive of such conduct being within the intended scope of section 1985(3).[69]

The Ku Klux Act was passed amid the lawless conditions existing in the South after the Civil War.[70] A major aim of the legislation "was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." [71] It is readily apparent from the title of the bill itself, "An Act to enforce the Provisions of the Fourteenth Amendment . . .," that the key concern of the legislators was to put force [72] behind the Civil War Amendments by providing an avenue for the redress of injuries suffered by the class of newly emancipated slaves.[73] Nowhere have we seen it suggested that Congress was concerned about discrimination being practiced against insolvents.[74]

This is not to say that the concept of "civil rights" and the protection afforded by the civil rights acts themselves, of which the Ku Klux Act is one, is static. Being closely allied with fundamental rights, civil rights are open-ended in character.[75] This fact has been manifested by Congress in recent years by its expansion of coverage to classes other than race. All provisions of the Civil Rights Act of 1964 prohibit discrimination based upon "race, color, religion, or national origin," [76] and Titles IV and VII of that Act include sex bias as well.[77] Moreover, the Supreme Court lately has more than once expanded that class of those rights we consider fundamental.[78] Nevertheless, as we have observed, Congress heretofore has refused to prohibit discrimination against bankrupts even though specifically asked to so,[79] and the Supreme Court has explicitly rejected the contention that the right to file in bankruptcy is fun-

---

**69.** It should be noted that whether Congress has the *power* to regulate certain activity is irrelevant in regards to whether Congress *intended* to do so. It is true that eight members of the *Griffin* Court found constitutional power under the facts of that case in the right to travel. *Id.* at 105–06, 91 S.Ct. 1790. The alleged violation of that right in *Griffin* was still a result of racial animus, however, which the Court appropriately identified as being at the core of section 1985(3)'s intended coverage.

**70.** *See generally Monroe v. Pape*, 365 U.S. at 170–82, 81 S.Ct. 473. The Court in *Monroe* pointed out that there was "no quarrel with the state laws on the books. It was their lack of enforcement that was the nub of the difficulty." *Id.* at 176, 81 S.Ct. at 478. One 600-page report oft-cited during the debate over the bill dealt with the activities of the Klan and the inability of the state governments to cope with it. *Id.* at 174, 81 S.Ct. 473. *See also* Randall, The Civil War and Reconstruction (1937).

**71.** 365 U.S. at 180, 81 S.Ct. at 480. In *Griffin* the Supreme Court made clear, of course, that the Act by the provision now codified in section 1985(3) allows a plaintiff to bypass entirely the state judicial machinery. 403 U.S. at 95–102, 91 S.Ct. 1790.

**72.** The Ku Klux Act was referred to as one of the "force bills". *See Monroe v. Pape*, 365 U.S. at 174–75, 81 S.Ct. 473.

**73.** *See* cases cited in note 47 *supra*. *See also Hague v. C.I.O.*, 307 U.S. 496, 509–10, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.).

**74.** The Bankruptcy Act of 1867, 14 Stat. 517, was in effect until 1878. *See* 20 Stat. 99.

**75.** *See, e. g., Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). *See generally* 3D. Sands, *supra* note 50, § 72.01.

**76.** 42 U.S.C. §§ 2000a(a), 2000a–1, 2000b, 2000c–6, 2000d & 2000e–2 (1970).

**77.** *Id.* §§ 2000c–6 & 2000e–2 (Supp. II 1972).

**78.** *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). *See also Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

**79.** See notes 48–56 *supra* and accompanying text.

damental.[80] In this light, we decline to enlarge the ambit of section 1985(3) to include bankrupts.[81] To hold otherwise would be tantamount to saying that Congress *intended* to include every class over which it has *power* to legislate. We simply do not believe that to be so.

We should point out that it is difficult to tell from McLellan's rather inartful pleading exactly what class he purports to be a member of for the purposes of this litigation.[82] However, in characterizing his class as that of all bankrupts we have analyzed the problem in the light most favorable to McLellan: if section 1985(3) protects all bankrupts, then it certainly protects the potential bankrupts who work for MPL or those who have been discharged for availing themselves of bankruptcy. Thus, the question has been whether Congress intended for section 1985(3) to protect bankrupts as a class, and we have found ourselves unable to hold that it does.

### V

In conclusion, we hold that the allegations before us do not disclose facts which demonstrate a conspiracy for the purpose of depriving McLellan of the equal protection of the laws within the meaning of 42 U.S.C. § 1985(3). Part III of the panel opinion,

which recognized that cause of action, is accordingly vacated. In all other respects, the panel opinion remains undisturbed. We affirm the district court's dismissal of the section 1985(3) claim and remand for further proceedings not inconsistent with this opinion.

AFFIRMED AND REMANDED.

RONEY, Circuit Judge, concurring:

I concur in the result reached by the majority. In doing so, however, I find myself in tentative agreement with Part I of Judge Godbold's dissent. Although I would not decide this unbriefed and unargued issue of independent illegality in this case, if it is to be decided, there seems little in the statute or the current law which would support a requirement that to establish § 1985(3) liability, one must show the conspirators conspired to commit an act independently illegal under state law. The statute condemns a conspiracy to achieve a result, not the precise means by which that result is to be accomplished.

Search as I may, however, I have been unable to find anything which would indicate that Congress intended to include the economic act of filing for bankruptcy among the rights protected from economic

---

**80.** *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). See note 52 and accompanying text.

**81.** Although we do not so hold, we could plausibly rest our holding on the position that discrimination practiced against bankrupts is not the type of "invidious" animus envisioned by the *Griffin* Court. *See* 403 U.S. at 102, 91 S.Ct. 1790. One court has stated, "A close reading of *Griffin* leads this Court to conclude that the words 'class-based, invidiously discriminatory animus' refer, at most, to that kind of irrational and odious class discrimination akin to racial bias—such as discrimination based on national origin or religion." *Arnold v. Tiffany*, 359 F.Supp. 1034, 1036 (C.D.Cal.), *aff'd on other grounds*, 487 F.2d 216 (9th Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974). *See also Taylor v. Nichols*, 409 F.Supp. at 935–36. Interesting to note is that the panel opinion also expressed some doubt as to whether the discrimination practiced in this case was sufficiently invidious to draw section 1985(3) into play. 526 F.2d at 879.

**82.** Apparently, the panel had some difficulty with this question as well. The panel firmly asserts that the relevant class is those MPL employees "wishing to file bankruptcy petitions," yet plainly states that McLellan himself was among the class of MPL employees who *actually filed* bankruptcy petitions. 526 F.2d at 877. Of course, with a concept as nebulous as that of "class," this will always be a troublesome area of analysis. Our experience here is not unique, however. Others have encountered similar difficulties in their prehension of cloudy subjects. *See* W. Shakespeare, *Hamlet*, III, ii, 11. 393 *et seq.*:

> HAMLET: Do you see yonder cloud that's almost in the shape of a camel?
> POLONIUS: By the mass, and 'tis like a camel, indeed.
> HAMLET: Methinks it is like a weasel.
> POLONIUS: It is backed like a weasel.
> HAMLET: Or like a whale?
> POLONIUS: Very like a whale.

sanction by section 1985(3). Interestingly, Judge Godbold's analysis depends entirely upon filing for bankruptcy. If McLellan had been fired because he failed to pay his debts, nothing in Judge Godbold's reasoning would afford any basis for a federal damage suit. And yet, when McLellan files for bankruptcy, demonstrating clearly that he *never* intends to pay his debts, he somehow becomes a member of a protected class.

The implication of any rule contrary to the Court's decision here could have such potentially far-reaching effects that it should not be imposed upon the commercial world without clear, constitutional, legislative action. Construing civil rights acts broadly to cover the wrongs and protect the rights at which Congress was aiming is one thing. To use that principle to create laws that Congress neither spoke to nor thought of is quite another.

I would affirm the dismissal of the § 1985(3) claim.

GODBOLD, Circuit Judge, with whom BROWN, Chief Judge and GOLDBERG, Circuit Judge, join, dissenting:

Five years ago the Supreme Court revived 42 U.S.C. § 1985(3) from quiescence in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). During the intervening years, litigation over the scope of the provision has centered upon its motivation requirement, and more particularly upon the nature of the "class-based, invidiously discriminatory animus" that must be alleged.

Today the en banc court unveils a wholly new requirement for § 1985(3) liability. It declares that the intended conduct of conspiring defendants must be violative of some law other than § 1985(3) before the conspiracy can be actionable under § 1985(3). This theory has not been discussed at any earlier stage of this litigation, has been neither briefed nor argued by the parties, and has not been perceived by any other circuit in previous § 1985(3) cases.[1] Nevertheless, the majority spins out the

new standard at length. Then, surprisingly, the en banc court declines to apply this theory to the case before us. Instead it falls back on the more familiar stance of holding that the plaintiff has not satisfied the class-based animus requirement.

Although the majority's discussion of the independent illegality test is really only an advisory opinion, courts will no doubt be urged to follow that test just as if it had been the subject of a holding. For that reason I will devote Part I of this dissent to discussing the unsoundness of the independent illegality standard.

In Part II, I will discuss the majority's disposition of the class-based animus requirement, although my comments will be brief because I have already treated this subject in my opinion for the panel majority.

Finally, Part III will address what I regard as the real motivation behind the majority's decision—a fear that § 1985(3) threatens to mushroom into "a general federal tort law." The guiding spirit of today's decision is not methodical and dispassionate legal reasoning but unarticulated judicial distrust of *Griffin v. Breckenridge*, crystallized into a firm resolve that the reach of the statute and of *Griffin* must be strictly curbed. Thus, in Part III I will discuss some of the restraints that validly limit the sweep of § 1985(3). This discussion, I hope, will ameliorate judicial fears that *Griffin* will give rise to a new body of federal tort law, uncertain in dimension.

## I. Independent Illegality

As the majority recognizes, the starting point for analysis must be the statute itself. *Griffin* listed four elements essential to a cause of action under § 1985(3). These requirements, paraphrased directly from the statute, are as follows:

> To come within the legislation a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another"

1. The majority's fallacious reliance upon the "thrust" of the Ninth Circuit in *Lopez v. Ar-* *rowhead Ranches*, 523 F.2d 924 (CA9, 1975), is discussed below.

(2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

403 U.S. at 102–03, 91 S.Ct. at 1798–99, 29 L.Ed.2d at 348.

The majority does not deny that three of the four elements are present in the instant case. McLellan has alleged a conspiracy, an act in furtherance of that conspiracy, and a resulting injury. Our sole concern is whether defendants' alleged conspiracy meets criterion (2), the motivation requirement of § 1985(3). Was the conspiracy formed "for the purpose of depriving [McLellan], either directly or indirectly . . . of the equal protection of the laws"?[2] This brings us to the point at which I part company with the majority: whether, within the meaning of § 1985(3), the defendant conspirators could seek to deprive McLellan of the equal protection of the laws if their intended action was not illegal under some other law. With all deference, I am convinced that there is no requirement of independent illegality.

Certainly there is nothing on the face of the statute that would lend support to the majority's interpretation. In speaking of a conspiracy aimed at "depriving [the plaintiff] of the equal protection of the laws," the provision unambiguously directs attention to the plaintiff's rights under the law. It does not touch upon the particular de-

fendant's duties under the law, except insofar as the plaintiff's rights may determine them. If it is true that the defendant's alleged activity must amount to a violation of the law independently of § 1985(3), that requirement must derive from a source outside the statutory text.[3]

The case law is equally unhelpful to the majority's view. When the Supreme Court in *Griffin* turned to the matter of whether the petitioners' complaint satisfied the motivation requirement of § 1985(3), it did not deal at all with the defendants' liability *vel non* under Mississippi law. Instead it discussed the plaintiffs' rights, and particularly their rights to "free speech, assembly, association, and movement." The Court did not intimate that the defendants' interferences with these federal rights could lead to § 1985(3) liability only because those interferences were independently illegal. When the Court referred to defendants' alleged "detention, threats, and battery" as establishing a cause of action, 403 U.S. at 103, 91 S.Ct. 1790, 29 L.Ed.2d at 349, it was discussing only the third criterion of the § 1985(3) cause of action, i. e., the necessity of an act in furtherance of the conspiracy. No one denies that the third criterion is met in the instant case.

As for lower court cases, Judge Tjoflat quotes from *Lopez v. Arrowhead Ranches*, 523 F.2d 924 (CA9, 1974). The complete relevant passage (indeed, even the portion quoted by Judge Tjoflat) is not phrased at all in terms of independent illegality of the conspirators' conduct but wholly in terms of the legal rights of the plaintiffs:

> [P]laintiffs have no legal right or entitlement either to be hired by the private employers, or to be free of discrimination on the basis of alienage when seeking private employment. The sole potential source of such a legal right of which we

---

**2.** Like the majority, I leave aside the language referring to "equal privileges and immunities under the laws", since the case can be decided without it.

**3.** The prevailing opinion does not say, nor could it, that the limiting amendment added to § 1985(3) during congressional debate is rele-

vant to the present argument. The limiting amendment was construed in *Griffin* to mean that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" must be alleged. As the majority recognizes, however, the application of the animus requirement raises entirely separate issues.

are aware, Title VII's proscription of private employment discrimination on the basis of national origin, 42 U.S.C. § 2000e–2(a)(1), has been held not to bar discrimination on the basis of alienage. Having no legal right *per se* to be free of the discrimination, the conspiracy not to hire plaintiffs' class does not deprive them of the protection of the laws, and hence is not *per se* actionable under § 1985(3).

*Id.* at 927 (cite omitted; footnote omitted). The majority, by some alchemy of reading between the lines, transmutes this precise reference to an absence of rights in the plaintiff into a "thrust" defining the nature of defendants' breach, i. e., the breach must violate some other law.[4]

With due respect, I think the majority employs *Lopez* (and, on this point, *Griffin* as well) purely as a makeweight. The true crux of the suggested independent illegality test is its reliance upon a dictum in *U. S. v. Harris*, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883). In *Harris* the Supreme Court struck down Rev.Stat. § 5519, a statute governing the same conduct as § 1985(3) but imposing criminal rather than civil penalties. In the discussion on which the majority focuses, the Court was arguing that § 5519 could not be sustained in its entirety under the Thirteenth Amendment. I give the complete argument here, italicizing the sentences quoted by Judge Tjoflat:

There is another view which strengthens this conclusion [that § 5519 cannot be sustained under the Thirteenth Amendment]. If Congress has constitutional authority, under the Thirteenth Amendment, to punish a conspiracy between two persons to do an unlawful act, it can punish the act itself, whether done by one or more persons.

*A private person cannot make constitutions nor laws, nor can he with authority construe them, nor can he administer or execute them. The only way, therefore, in which one private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault or murder.* If, therefore, we hold that section 5519 is warranted by the Thirteenth Amendment, we should, by virtue of that amendment, accord to Congress the power to punish every crime by which the right of any person to life, property or reputation is invaded. Thus, under a provision of the Constitution which simply abolished slavery and involuntary servitude, we should, with few exceptions, invest Congress with power over the whole catalogue of crimes. A construction of the Amendment which leads to such a result is clearly unsound.

106 U.S. at 642–43, 1 S.Ct. at 612, 27 L.Ed. at 295 (emphasis added).

4. In fact, the *Lopez* court left open the possibility that the defendants' conduct was violative of at least one law, namely 8 U.S.C. § 1324. The court held that § 1324, being solely a penal provision, vested *no legal rights* in the plaintiffs and thus could not support their complaint. 523 F.2d at 926. *Place v. Shepherd*, 446 F.2d 1239 (CA6, 1971), also cited by the majority, was similar to *Lopez*. The court denied relief on the theory that the plaintiff's claimed right to employment, allegedly infringed by the defendants' conspiracy, was not a "federal civil right."

Although the majority ultimately states that § 1985(3) is essentially a remedial statute and creates no rights of its own force, 545 F.2d at 927 n.32, it declines to rely on earlier authorities that have considered the validity of that proposition, *id.* at 925 n. 22. I agree that those authorities are not apposite here. The central question with which they have dealt is whether or not § 1985(3) protects Fourteenth Amendment interests by proscribing activities that, owing to their wholly private nature, do not fall within § 1 of the Amendment itself. *See Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (CA7), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (CA4, 1974); *Dombrowski v. Dowling*, 459 F.2d 190 (CA7, 1972). *See also U. S. v. Guest*, 383 U.S. 745, 754–55, 86 S.Ct. 1170, 16 L.Ed.2d 239, 247 (1966) (same issue resolved as to § 241). A holding that § 1985(3) does reach that far could raise the further issue of whether Congress has the constitutional power to enact such a statute under § 5 of the Fourteenth Amendment. Compare Civil Rights Cases, 109 U.S. 3, 18–19, 3 S.Ct. 18, 27 L.Ed. 835, 842 (1883), *with U. S. v. Guest, supra.* Since the present case does not involve any Fourteenth Amendment claims, these issues are not at stake here.

Although the majority characterizes the italicized language as a holding, it is apparent that these two sentences are something less than directly controlling authority for our purposes. They were pronounced in the course of a constitutional discussion, and there are no constitutional issues in controversy here.[5] Moreover, they were not directed at the conspiracy provisions (§ 5519 and § 1985(3)), but instead at a hypothetical statute punishing "the act itself." The en banc court must be saying that this passage, even if not technically binding, should be respected and followed as the Supreme Court's definitive explanation of how "one private person can deprive another of the equal protection of the laws." For several reasons, however, I cannot accept even that more modest position.

First, even on its face the *Harris* opinion belies any assumption that these two sentences were a carefully considered construction of Rev.Stat. § 5519. The Justices had little incentive to develop a workable interpretation of the statutory wording, since they were striking down the statute as unconstitutional anyway. These two sentences were merely passing observations penned as part of a *reductio ad absurdum*

constitutional argument built upon rigid and now-obsolete juridical premises.[6] Such offhand remarks should not be confused with a serious effort to impart permanent meaning to Congress' phraseology.

This conclusion is reinforced by the fact that the *Harris* Court's theory had a rather short life span in the Supreme Court. Less than nine months later, the Court evidently changed its mind and indicated that committing a private crime against another person is *not* the same thing as depriving him of equal protection under the laws. See *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).[7]

More fundamentally, the *Harris* dictum is obsolete because of its incompatibility with the spirit of *Griffin v. Breckenridge*. This passage reflects the highly unsympathetic approach to the Reconstruction civil rights statutes that was typical of Supreme Court opinions in the late nineteenth century. *Griffin* is a clear indication that the Court is prepared to take a more expansive view of § 1985(3) and would not follow *Harris's* crabbed construction today.

A further reason I cannot accept the theory that depriving a person of "equal pro-

---

5. In its brief before the en banc court, MPL "admits that ample constitutional power has existed for Congress to protect bankrupts from discharge." Brief at 11.

6. As Judge Tjoflat notes, the jurisprudence of that era dictated that a statutory provision could not be upheld if any of its possible applications exceeded Congress' legislative powers under the Constitution.

7. The Court there said:

"In this connection it is proper to state that civil rights, such as are guarantied by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property or his reputation; but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by resort to the laws

of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts or to be a witness or a juror; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment; and amenable therefor to the laws of the State where the wrongful acts are committed."

109 U.S. at 17, 3 S.Ct. at 25, 27 L.Ed. at 8

I do not mean to suggest that the *Civil Rights Cases'* interpretation of a deprivation of legal rights would be considered correct today. The Court was apparently saying that in the absence of state action private individuals cannot bring about a deprivation of legal rights at all. The specific holding of *Griffin* repudiated that position. *See* 403 U.S. at 97, 91 S.Ct. 1790, 29 L.Ed.2d at 345. I call attention to this passage

tection of the laws" entails committing a private crime or tort is that the equation is so illogical. Common sense tells us that private individuals can, without breaking any specific law, place cognizable obstacles in the path of someone's "equal enjoyment of legal rights." I believe that § 1985(3) was enacted to provide redress where legal rights are thus endangered.

In response to my "common sense" argument it may be suggested that to "deprive" a person of legal rights, as the term is used in § 1985(3), means something more than mere interference or obstruction. Yet, putting aside the conspicuous fact that the statute specifies that the deprivation may occur "either directly or indirectly," I do not believe that the connotations of "deprive" necessarily lead us to the conclusion that § 1985(3) liability depends on a violation of other law. The case law under 42 U.S.C. § 1983 calls for an opposite conclusion. Section 1983 imposes liability on every person who, under color of law, "subjects or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." It seems fair to assume that the word "deprive" is used with a single meaning in these two statutes, since they were enacted simultaneously.[8] And under the precedents a private person can be held to have caused a § 1983 "deprivation" of legal rights without regard to whether his acts are independently illegal. *Adickes v. Kress & Co.*, 398 U.S. 144, 171–72, 90 S.Ct. 1598, 26 L.Ed.2d 142, 162 (1970); *Smith v. Brookshire Brothers, Inc.*, 519 F.2d 93 (CA5, 1975), *cert. denied,*

424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1976).[9]

The decision of the en banc court does have its historical ironies. Over the decades one focal point in controversies over the Reconstruction civil rights statutes has been whether other state or federal remedies will adequately protect plaintiffs' interests, or whether, instead, those remedies need to be supplemented by federal civil rights remedies. See, e. g., *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (§ 1983 versus other federal remedies); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (§ 1983 versus state remedies); *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1950) (§ 1985); *U. S. v. Waddell*, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884) (§ 241). Now the prevailing opinion suggests that existence of independent illegality, presumably carrying with it some alternative remedy, is a prerequisite for § 1985(3) recovery. I would have thought that the strongest, not the weakest, case for application of § 1985(3) is presented when no other law protects the exercise of an important right.

Thus it appears that the majority's theory, although extensively researched, has serious analytic defects. Some will perhaps defend it on the ground that, whatever its deficiencies, at least it provides a means of keeping the statute within manageable bounds. I do not regard the supposed spectre of sweeping § 1985(3) liability as very menacing, for reasons that will be explained in Part III of this opinion. Assuming the need for some new limitation, however, the independent illegality test does

---

merely to show (1) that whatever a "deprivation of the equal protection of the laws" may be, it cannot logically be equated with committing an illegal act, and (2) that the Supreme Court has by no means decisively committed itself to the fallacy of equating them.

8. Section 1983 and § 1985 were, respectively, § 1 and § 2 of the Civil Rights Act of 1871.

9. In *Adickes* it was conceded that the defendant had also violated the Civil Rights Act of 1964, but the Court emphasized that this fact played no part in its analysis. 398 U.S. at 150

n.5, 90 S.Ct. 1598. In *Smith* we noted that the defendant might be liable in tort "depending on the state's false imprisonment standard," but we left that issue open.

*Adickes* and *Smith* involved defendants who, in the words of *Harris*, did not "make . . . nor . . . construe . . . nor . . . administer or execute" the laws. The defendants were held to have acted "under color of law" only because they had conspired with state authorities. Therefore, these cases have a direct bearing on the question of whether the *Harris* theory has any vitality today.

not commend itself as a very workable proposal. The uncertainties it embodies become apparent when the majority tries to apply it to McLellan's complaint. After surveying a number of possible theories that might suffice to make the defendants' alleged conduct illegal, the majority finds most of these theories wanting. But the analysis of the various ways in which McLellan does not qualify under this standard turns out to be unimportant, because in one way he does qualify. His complaint alleges that the defendants, in conspiring to bring about his discharge, intended to act in violation of their duties under the contract of employment. I see no reason why this allegation should not satisfy the independent illegality test as the en banc court has outlined it,[10] and Judge Tjoflat does not seriously argue that the allegation is insufficient.[11]

The unwieldiness of the majority's gloss on § 1985(3) is manifest. Before the test can affect a given plaintiff, the court must canvass every law that might be thought to prohibit the defendants' intended conduct. The court must even survey the laws of the state where the claim arose, although federal judges are not experts on state law, and although one would not initially think that § 1985(3) liability should depend on what conduct the state has chosen to proscribe.

## II. Class-Based Animus

In my opinion for the panel majority, I discussed in detail my reasons for believing that McLellan satisfied the "class-based ani-

mus" requirement sufficiently to survive a motion to dismiss. The problem, as I see it, involves ascertaining the strength and scope of the federal policy of solicitude for bankrupts or potential bankrupts. Since, as the panel opinion observed, this is a complicated and close question, I can understand why the en banc court has struck a different balance on that narrow subject. I am concerned, however, about some of the broader principles that the majority has invoked to bolster its position. In my view they are misconceived and call for comment.

Judge Tjoflat draws attention to the "lawless conditions existing in the South" that prompted enactment of the Ku Klux Klan Act. This historical account is apparently mentioned as a means of contrasting those conditions with the gravamen of McLellan's complaint. But since the majority has seen fit to draw its legislative history almost exclusively from Justice Douglas' summary of the congressional debates in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), we would do well to remember Justice Douglas' remark about the limited relevance of that history: "Although the legislation was enacted because of the conditions that existed in the South at that time, *it is cast in general language* . . . ." 365 U.S. at 183, 81 S.Ct. at 482, 5 L.Ed.2d at 502–03 (emphasis added).

On the specific question of whether the class-based animus requirement limits § 1985(3) to remedying the problems that

---

10. By its references to Prosser's torts treatise, 545 F.2d at 926 n. 26, the majority indicates that the requisite "independent violation of law" need not stem from the Constitution or a statute, but may instead be derived from the common law.

11. The majority opinion drops a few hints as to why a breach of contract claim would not meet the standard, but I find none of them persuasive. I cannot accept the suggestion that McLellan's complaint might be inadequate because he "does not allege that the defendants contemplated depriving him of the operation of any state law—substantive or procedural—available to anyone seeking, as he is, the enforcement of contract rights." If this remarkable intimation were taken seriously, it would

mean that the majority was adopting the old *Civil Rights Cases* definition of a deprivation of legal rights (*see* note 7, *supra* ). The notion that § 1985(3) requires interference with the state's remedial machinery is not only inconsistent with the dictum in *U. S. v. Harris* from which the majority derives its "independent illegality" test; it is also impossible to reconcile with the facts of *Griffin v. Breckenridge*, where a complaint was upheld without any hint that the alleged conspiracy had aimed at an impairment of the plaintiffs' access to governmental remedies for their injuries. As *Griffin* pointed out, Congress dealt with this kind of conduct in an entirely different clause of § 1985(3), not before us today. 403 U.S. at 99, 91 S.Ct. 1790, 29 L.Ed.2d at 346.

were uppermost in the Forty-second Congress' mind, the Supreme Court has already hinted at an expansive approach. In *Griffin* the Court observed that the record before it did not present an issue of whether nonracial animus would be covered by the statute. At the same time the Court cited a remark of Senator Edmunds (one of the managers of the bill) as bearing on the issue, 403 U.S. at 102 n. 9, 91 S.Ct. 1790, 29 L.Ed.2d 348 n. 9. That remark is as follows:

> We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent one getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, (which is a pretty painful instance that I have in mind in the State of Florida within a few days where a man lost his life for that reason,) then this section could reach it.

42d Cong., 1st Sess. 567 (1871), reprinted in A. Avins, *The Reconstruction Amendments' Debates* 547 (1967). I take it that the significance of Senator Edmunds' comment is that § 1985(3) reaches beyond racially based conspiracies [12] and beyond the problems perceived to be pressing in 1871. At a minimum it supports the majority's intimation that the provision is open-ended rather than static in the rights it protects.

I also take issue with the majority's tentative attempt to equate the rights protected by § 1985(3) with the familiar yet vague category of "fundamental rights." This sounds like the language associated with "strict scrutiny" under the Fourteenth Amendment. In the panel opinion I have suggested that a class need not be a Fourteenth Amendment "suspect group" in order to qualify for protection under § 1985(3). 526 F.2d at 877–78 n. 15. The same reasoning is applicable here.

It is not clear to me whether the majority would agree with what has been said in this section. If it would, then perhaps we disagree only on the relationship between § 1985(3) and the right to file in bankruptcy. On that score the panel opinion speaks for itself and I am content to rest on what it says.

### III. A "General Federal Tort Law"?

The majority's suggestion of engrafting the independent illegality test upon § 1985(3), together with its possibly too narrow application of the class-based animus requirement, can be traced to a fear of allowing a "general federal tort law" to creep into our civil rights jurisprudence. The fear is unnecessary. The construction of the statute enunciated in the panel opinion does not imply unacceptably broad liability. There are several constraining factors that will tend to keep the statute within manageable bounds in any event.

First, there must be a conspiracy. Without committing myself at this time to its correctness, I call attention to the Seventh Circuit's holding that a corporation cannot conspire with itself, for purposes of § 1985. *Dombrowski v. Dowling*, 459 F.2d 190 (CA7, 1972). Thus, for example, if McLellan had not succeeded in joining his union as a party defendant (under a ruling of the panel that is not affected by today's decision), he would have been out of court under the *Dombrowski* test.

Second, under *Griffin* the animus behind the conspiracy must be "class-based". One

---

**12.** Another reason for not confining § 1985 to racial contexts is that it seems much more closely related to § 1983, which has been expanded beyond the area of race, than to §§ 1981 and 1982, which have not. The latter two sections make specific references to race, whereas §§ 1983 and 1985 do not. Furthermore, the historical background of §§ 1981 and 1982 is somewhat different from that of the Act which included §§ 1983 and 1985. *See generally District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

who reads the reported cases on this statutory provision will notice that courts have readily dispensed with most § 1985(3) claims upon finding that the alleged deprivation was attributable to the plaintiff's individual situation rather than his class membership. See, for example, the cases discussed in the panel opinion, 526 F.2d at 877.

Third, as illustrated by today's holding, not every class is necessarily protected from discrimination under § 1985(3). Even if the en banc court had agreed with the panel that a class of bankrupts falls within the statutory coverage, other protected classes would have had to be determined as the cases presented them for decision.

Fourth, the panel decision specifically observed that under *Griffin* the plaintiff would have to prove that the alleged discriminatory intent was "invidious". 526 F.2d at 879. Thus, contrary to what the majority seems to think, 545 F.2d at 927 n. 33, the panel did not contemplate that the animus requirement would be satisfied simply by a showing that the defendants' conspiracy was directed against a protected class. Because of the "invidiousness" criterion, legitimate commercial practices would not have been jeopardized by the panel's construction. Although the en banc court indicates that it might have been willing to hold that "discrimination practiced against bankrupts is not the type of 'invidious' animus envisioned by the [Supreme] Court," id. at 933 n. 81, I would not have reached such a conclusion on the bare record presented by this appeal. I believe the panel's decision to remand for factual exploration of the propriety of MPL's policy was sounder.

Fifth, even a plaintiff who meets all of *Griffin*'s prerequisites for a prima facie case must contend with the possibility that the defendant will raise affirmative defenses. The Supreme Court has held that 42 U.S.C. § 1983 does not abolish all common-law defenses but rather is to be read in light of the principles of official immunity discernible in "the background of tort liability" in this country. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). It is reasonable to suppose that § 1985(3), enacted as part of the same piece of legislation, is confined within similar bounds. Indeed, the first Supreme Court case sustaining an official immunity defense under § 1983, *Tenny v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), also involved a § 1985(3) claim, which the Court treated identically. More recently, this court has specifically held that some of the immunity defenses available under § 1983 are also available under § 1985.[13]

Sixth, any § 1985(3) case potentially raises a question of Congress' constitutional power to impose liability for the conduct alleged. The Court in *Griffin* explicitly declined to hold that § 1985(3) could constitutionally be applied to every conspiracy falling within the statute's terms. 403 U.S. at 104, 91 S.Ct. 1790, 29 L.Ed.2d at 349.

In view of all these factors, I see no justification for the majority's discussion of placing an arbitrary barrier in the path of § 1985(3) plaintiffs. For the reasons stated here and in the panel opinion, I dissent.

---

13. *City of Safety Harbor v. Birchfield*, 529 F.2d 1251 (CA5, 1976) (legislative immunity); *Hill v. McClellan*, 490 F.2d 859 (CA5, 1974) (judicial immunity). *See also Waits v. McGowan*, 516 F.2d 203 (CA3, 1975); *Dotlich v. Kane*, 497 F.2d 390 (CA8, 1974); *Hampton v. City of Chicago*, 484 F.2d 602 (CA7, 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974).