Philip CARCHMAN and Marilyn R.
Carchman, h/w

v.

The KORMAN CORPORATION.

Civ. A. No. 77-2477.

United States District Court,
E. D. Pennsylvania.

July 21, 1978.

As Amended Sept. 19, 1978.

Paul W. Tressler, Franconia, Pa., for plaintiffs.

Barbara E. Etkind, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a civil rights action which requires us to define the character of the "classes" against which a 42 U.S.C. § 1985(3) conspiracy may properly be directed. The plaintiffs allege that their apartment lease was not renewed by defendant, the operator of a large private apartment complex, in order "to stifle and discourage (husband) plaintiff's exercise of his freedom of speech and association" as an active member of a tenants association at the apartment complex. The 12(b)(6) motion before us presents the question whether a 1985(3) conspiracy may be directed against the members of a private tenants association in light of the "class-based animus" requirement set forth in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Concluding that such members do not constitute a proper *Griffin* "class," we dismiss the complaint.[1]

1. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343(1). Even though the latter does not require a jurisdictional amount, plaintiffs have alleged that their damages, including

The first ten paragraphs of plaintiffs' amended complaint are based solely on the First Amendment, rather than on any civil rights act. They need not detain us. The First Amendment by its terms protects against "Congress . . . mak[ing] [a] law . . . abridging the freedom of speech . . . ."

It is, of course, a common place that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state. . . . Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the constitution itself.

■ *Hudgens v. N. L. R. B.*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). Since plaintiffs have made no allegations of state or federal action, the first ten paragraphs of the amended complaint must be dismissed for failure to state a claim upon which relief can be granted.

More troublesome is the 1985(3) claim.[2] The amended complaint alleges that defendant and its agents conspired with the Meadowbrook Valley Partnership, the owner of the development, and its agents, to deprive plaintiffs of their First and Fourteenth Amendment rights to speech and association, and that they acted, in furtherance of the conspiracy, by failing to renew plaintiffs' lease. It further alleges that the conspiracy was in retaliation for the plaintiffs' participation in the tenants association. Defendant has moved to dismiss the § 1985(3) claim on three grounds. First, defendant contends that the complaint contains insufficient allegations of a conspiracy in that the alleged co-conspirators are mere agents (or alter egos) of the defendant and that one cannot conspire with oneself. Second, defendant contends that the complaint does not allege a sufficient class-based animus to meet the requirements of § 1985(3). Third, defendant asserts that § 1985(3) can only protect the right of free speech from governmental interference, federal or state, and that there is simply no cognizable right under § 1985(3) to be protected from wholly private infringement of the exercise of the rights of speech or association.

■ This latter point is a most difficult one, on which the law is far from clear.[3]

the cost of moving, medical care, emotional trauma to Mrs. Carchman, and infringement of First Amendment rights, are in excess of $10,000.

2. The original complaint was based solely on the First Amendment. When defendant moved to dismiss on the basis that no state action had been alleged, plaintiffs sought leave to amend to include a cause of action under 42 U.S.C. § 1985(3). Leave was granted. The 1985(3) claim makes up the balance of the (amended) complaint.

3. The issue is whether § 5 of the Fourteenth Amendment empowers Congress to reach private violations of substantive rights secured by the Fourteenth Amendment (including, of course, those parts of the Bill of Rights incorporated therein), or whether, alternatively, the substantive rights secured by the Fourteenth Amendment and hence protected by § 1985(3) are protected only against state and not private infringement. A subsidiary issue, given the fact that it is the plaintiff's tenants rights advocacy which is said to have motivated defendants' actions, is whether, even if most rights are protected only against state, not private,

infringement, First Amendment rights call for a different result because of the "special deference" owed that amendment. *See Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 829 n.33 (7th Cir. 1975).

The 4th and 7th Circuits have held that the substantive rights protected by the Fourteenth Amendment are only protected from state, not private, infringement. *Cohen, supra; Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972). Moreover, the 7th Circuit recently resolved the question left open in *Cohen* by holding that an allegation of infringement of a First Amendment right did not call for any different conclusion. *Murphy v. Mount Carmel High School*, 543 F.2d 1189 (7th Cir. 1976).

In contrast, the 8th Circuit has held that the rights secured by the Fourteenth Amendment are protected from private, as well as state, conspiracies. *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971). Although *Gannon* involved the First Amendment freedom of religion, the court's conclusion did not rest on a narrow First Amendment exception, as suggested later by *Cohen*, but rather on the general conclusion

Fortunately, however, we need not reach it. For, while it appears that plaintiffs can, at this stage, survive a motion to dismiss on the first asserted ground,[4] the complaint

that *all* Fourteenth Amendment rights are protected under § 1985(3) from private infringement.

The 3rd Circuit's opinion in *Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971) sustained a cause of action under § 1985(3) where plaintiff alleged he had been fired from his job for criticizing his employer's racially discriminatory employment policies, and for advocating the election of politicians who promised to ameliorate racial prejudice. His employer was wholly private. The result in *Richardson* implicitly supports *Gannon*'s conclusion, although it must be emphasized the court did not address this question squarely in the opinion. It is thus difficult for us to tell whether *Richardson* is binding precedent on this issue or not, although at least to Judge, now Justice, Stevens, the *Richardson* decision aligned the 3rd Circuit with the 8th Circuit's *Gannon* decision. *See Cohen, supra*, at 829 notes 31 and 33.

The complexity of this issue is, perhaps, best demonstrated by Judge Spencer Williams' recent opinion in *Baer v. Baer*, 450 F.Supp. 481, (N.D.Cal.1978). Judge Williams, after analyzing the Supreme Court and various Circuit decisions on the subject, decided that the question was enormously complex and that therefore it would be "unsound" for a federal trial court to follow *Gannon* in the absence of clear Supreme Court authority that § 5 of the Fourteenth Amendment empowered Congress to reach private conspiracies to violate First Amendment rights.

4. Plaintiffs' allegation of conspiracy is as follows:

13. Between May of 1973 and September 30, 1975, defendant Korman Corporation along with their agents, Williams C. Liss, General Manager of Meadowbrook Apartments, and Steven A. Arbittier, Esquire, and J. E. Dratch, M. B. Dratch, M. Dratch, H. A. & L. Honickman, B. E. Korman, L. I. Korman, S. H. Korman, S. J. Korman, J. M. Lansfield, I. B. Moss, S. R. Moss, E. Taxin, M. A. Taxin Grabov and R. N. Taxin, trading as the Meadowbrook Valley Partnership with a business address at 101 Greenwood Avenue, Jenkintown, Pennsylvania 19046, maliciously and with intent to injure Plaintiffs, conspired together . . .

The syntax and punctuation are not a model of clarity. It appears to us that the conspirators alleged are (1) the Korman Corporation and their agents, Liss and Arbittier; and (2) the Meadowbrook Valley Partnership and its fifteen members. Defendant Korman Corporation is alleged to be Managing Agent of the Meadowbrook Apartments (¶ 4). The partnership is elsewhere alleged to be the owner of the Meadowbrook Apartments, where plaintiffs lived until their lease was terminated (¶¶ 4, 14).

Liss is alleged to be an agent of the Korman Corporation, and also to be the General Manager of the Meadowbrook Apartments (¶ 13 quoted above). Hence the only defendant in this suit—the Korman Corporation—is apparently a conspirator because one or more of its employees allegedly conspired with the apartment owners to terminate the lease; the individual employees' actions are apparently attributable to the defendant under the doctrine of *respondeat superior.*

The issue is whether, assuming the actions of Liss and Arbittier *et al* were within the scope of their employment so that any actions taken by them are attributable to the corporation (there is no allegation to this effect, but defendant has not challenged its absence, and we will assume it for purposes of this motion), the allegation that a corporation acting as managing agent conspired with the landlord can state a 1985(3) claim of conspiracy as a matter of law.

Defendant relies on *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972) which took the position that

. . . the statutory requirement that 'two or more persons . . . conspire or go in disguise on the highway,' is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. *But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute.*
*Id.* at 196 (emphasis supplied).

The *Dombrowski* rationale, based on principles evolved in antitrust law about permissible conspirators under the Sherman Act, *see Cole v. University of Hartford*, 391 F.Supp. 888 (D.Conn.1975), is limited to a situation where individual conspirators are employees of a single corporation. It has no application when two distinct business entities are alleged to have conspired together, for *Dombrowski* speaks of "two or more agents" of a "*single* business entity" (emphasis supplied). Hence, the issue before us is whether there really are distinct business entities alleged.

In this case the pleadings state that there are two discrete business entities involved, the Meadowbrook Valley Partnership (owner of the realty) and the Korman Corporation which has been designated by the Partnership as its "managing agent." It may well be that discovery will disclose that the Meadowbrook

fails the class-based animus test, requiring dismissal.

## II. *Discussion*
### A. *Elements of the § 1985(3) Cause of Action*

Paragraphs 11–19 of the amended complaint invoke 42 U.S.C. § 1985(3). The elements of this cause of action were enumerated in *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971):

(1) the defendants must conspire

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) the defendants must act in furtherance of the object of the conspiracy, whereby

(4) one was (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.

The remainder of this opinion is addressed to element 2, namely whether a sufficient conspiratorial purpose has been alleged.

### B. *Sufficiency of Allegation of Conspirational Purpose—the Class-Based Animus*

■ The second element of a § 1985(3) suit identified by *Griffin, supra*, is a mens rea requirement—that the conspirators have a particular kind of purpose. By its terms, § 1985(3) requires that purpose to be one:

. . . of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

*Griffin, supra*, gave to this section, which is very expansive on its face, a gloss in order to prevent § 1985(3) from becoming "a general federal tort law." 403 U.S. at 102, 91 S.Ct. at 1798. That gloss was the requirement for there to be:

as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. . . . The language requiring intent to deprive of *equal* protection or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.

*Id.* (Emphasis in original.) As we read *Griffin*'s language, the requirement means that motivating the conspiracy there must be a discriminatory animus toward a *class*, not toward an individual qua individual. In other words, the conspirators must possess a class-based state of mind. As such, the *Griffin* gloss in effect eliminates the words "any person" from the phrase "for the purpose of depriving . . . *any person* or class of persons."

The second effect of the *Griffin* gloss is to suggest that not just any class-based animus on the part of the conspirators will suffice. § 1985(3) on its face states "any . . . class," but *Griffin* narrows "any . . . class" to "racial or perhaps otherwise class-based" conspiratorial motivation. Does this inferentially suggest that the class-based animus motivating the conspiracy be only racial, or at least *like* racial animus? *Griffin* expressly left this question open, stating, "we need not decide, given the facts of this case, whether a con-

---

Partnership and the Korman Corporation are in reality a single business enterprise. However, on the present record there are two presumably discrete business entities, hence the complaint appears to pass muster under *Dombrowski*. In any event the complaint would survive a motion to dismiss under *Columbia Metal Culvert Company v. Kaiser Aluminum*, 579 F.2d 20 (3d Cir. 1978), which held that a corporate parent and its wholly-owned subsidiary with whom it shared significant joint management organiza-

tion could legally conspire together for purpose of *Sherman* § 1. *Columbia Metal* thus re-affirmed the vitality of the "intra-enterprise conspiracy" theory as applied to separately incorporated entities for *Sherman* § 1 purposes, *see* 579 F.2d at 33, a legal principle which we take to be equally applicable to a § 1985(3) conspiracy.

Therefore, we find plaintiffs allegation as to the existence of a conspiracy sufficient to withstand a motion to dismiss.

spiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us." *Id.* at 102 n.9, 91 S.Ct. at 1798 n.9. *Griffin* created further ambiguity by then citing, without comment, legislative history suggesting that intended classes included "Vermonters," "Catholics" and "Democrats." *See* legislative history cited *id.*

In the face of this suggestive but equivocal language, our task is to decide whether *Griffin*'s requirement of "racial or perhaps otherwise class-based invidiously discriminatory animus" is satisfied by an allegation of a conspiracy on the part of private business entities directed against a tenants association at a private apartment complex, *i. e.* a group of individuals asserting tenants rights.[5] Is a conspiracy against such an association "class based" within the meaning of *Griffin*? Otherwise put, is a private tenants association a *Griffin* "class" at which a § 1985(3) conspiracy can be directed?

Given the ambiguity of *Griffin*, it is not surprising that lower court cases since that decision have reached discordant, if not irreconcilable, conclusions. Most of these cases have been collected and analyzed in two recent articles, Comment, "Private Conspiracies to Violate Civil Rights," 90 Harvard L.Rev. 1721 (1977), and Note, "The Scope of Section 1985(3) Since Griffin v. Breckenridge," 45 George Wash.L.Rev. 239 (1977), and in the recent decision by Judge Spencer Williams in *Baer v. Baer*, 450 F.Supp. 481 (N.D.Cal.1978). Our observation about the multitude of disparate and incompatible conclusions in the caselaw is demonstrated by comparing two groups of cases.

The first group found cognizable classes under *Griffin*. *See Means v. Wilson*, 522

F.2d 833 (8th Cir. 1975) *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (political group supporting candidate for Indian tribal council President); *Azar v. Conley*, 456 F.2d 1382 (6th Cir. 1972) (single white, middle-class family); *Action v. Gannon*, 450 F.2d 1227 (6th Cir. 1971) (religious group); *Baer v. Baer*, 450 F.Supp. 481, (N.D.Cal.1978) (religious group); *Brown v. Villanova University*, 378 F.Supp. 342 (E.D. Pa.1972) (student committee); *Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025 (E.D. Va.1973), *aff'd* 508 F.2d 504 (4th Cir. 1974) (persons asserting First Amendment rights); *Stern v. Massachusetts Indemnity and Life Insurance Co.*, 365 F.Supp. 433 (E.D.Pa.1973) (women); *Mandelkorn v. Patrick*, 359 F.Supp. 692 (D.D.C.1973) (religious group); *Franceschina v. Morgan*, 346 F.Supp. 833 (S.D.Ind.1972) (those who aid migrant workers) and *Folgueras v. Hassle*, 331 F.Supp. 615 (W.D.Mich.1971) (migrant workers themselves).

The second group found *no* cognizable class under *Griffin*. *See McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (petitioners in bankruptcy); *Denman v. Leedy*, 479 F.2d 1097 (6th Cir. 1973) (victims of domestic strife); *Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972) *cert. denied* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (physicians testifying in malpractice cases); *Taylor v. Nichols*, 409 F.Supp. 927 (D.Kan.1976) (policemen); *Furumoto v. Lyman*, 362 F.Supp. 1267 (N.D. Cal.1973) (political protesters); *Arnold v. Tiffany*, 359 F.Supp. 1034 (C.D.Cal.1973) (newspaper dealers association).

When we look to the caselaw, not for specific results, but for guiding principles of adjudication which are transferable to our factual situation, we find in two of the cases, one from each of the two groups,

---

5. Plaintiffs' complaint, as originally filed and as first amended, contained no allegation of class-based animus. Rather, the complaint simply alleged a conspiracy directed against plaintiffs. Omission of an allegation of class-based animus would have required our dismissal of the complaint under *Waits v. McGowan*, 516 F.2d 203, 208 (3d Cir. 1975). At a status conference, however, plaintiffs made what we viewed as a good-faith allegation that the alleged conspiracy was directed toward the class of tenant association members, not simply against the plaintiffs individually. Accordingly, we permitted a second amendment to the complaint, which involved an allegation of a conspiracy motivated by invidiously discriminatory animus against the class of tenant association members.

helpful statements of (contrasting) conceptualizations of the meaning of *Griffin*'s class-based animus requirement. The expansive interpretation is found in the Eighth Circuit's *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975). The *Means* test for defining the "classes" against which class-based animus may be directed is:

> There need not necessarily be an organizational structure of adherents, but there must exist an identifiable body with which the particular plaintiff associated himself by some affirmative act. It need not be an oath of fealty; it need not be an initiation rite; but at least it must have an intellectual nexus which has somehow been communicated to, among, and by the members of the group.

For shorthand, we will call this the "intellectual nexus" test.[6]

A considerably more restrictive test was formulated in *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (*en banc*), (*McLellan II*), reversing, *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 879 (5th Cir. 1976) (*McLellan I*). The *McLellan II* court decided that individuals who filed petitions in bankruptcy were *not* a cognizable class against which class-based animus could be directed. While not deciding the exact scope of *Griffin*, and in fact leaving open the possibility, as *Griffin* did itself, that only racial animus would suffice, 545 F.2d at 929, the *McLellan II* court identified two categories of "classes" as falling within the permissible definition of class for class-based animus purposes. The first are those "classes" of minorities protected by both reconstruction and modern civil rights laws: classes defined by race, color, religion, national origin, gender, *et alia.* 545 F.2d at 932. Second are classes of persons who assert rights considered "fundamental." *Id.* Finding that those filing for bankruptcy satisfied neither construct, the *McLellan II* court held such petitioners were not a cognizable class for § 1985(3) purposes. *Id.* at 933.

Our initial task is to choose between the "intellectual nexus" test of *Means* and the *McLellan II* formulation. We reject *Means* for several reasons. First, we believe it interprets the *Griffin* language in altogether too expansive a fashion. *Griffin*, it will be remembered, required a "racial or perhaps otherwise class-based, invidiously discriminatory animus"; *Means* converts this to an "identifiable body" with commonly shared views. "Invidiously discriminatory class-based" connotes to us something akin to the "discrete, insular minorities" described in *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S.Ct. 778, 783 n.4, 82 L.Ed. 1234 (1938)—in other words: (1) a class that has more stable, well-defined characteristics than merely sharing views in common, *and* (2) a class whose stable, well-defined characteristics have historically been vulnerable to prejudice by the society at large. The *Means* test does not reflect either of these connotations of *Griffin*'s use of "class." As we see it, neither the sense nor the language of *Griffin* is susceptible of the interpretation that the Supreme Court was thinking in terms of an animus directed against any group whose members have only an intellectual nexus in common. For that reason alone we must reject the *Means* test.[7]

Our second reason for rejecting *Means* is that the "intellectual nexus" criteria are vague, amorphous, and boundless, in the sense that a virtually limitless number of classes fall within its ambit. Indeed, it is difficult to imagine an aggregation of two or more individuals who would *not* satisfy the *Means* requirement. A member of a group of disco dancers, or vegetarians, or backgammon players, who sued alleging that he or she had been impeded in the

---

6. This test was originally formulated in *Westberry v. Gilman Paper Co.*, 507 F.2d 206 (5th Cir. 1975) and then withdrawn by the Fifth Circuit *en banc*. *Id.* at 215.

7. *See Arnold v. Tiffany*, 359 F.Supp. 1034, 1036 (C.D.Cal.1973), where the Court stated: "A close reading of *Griffin* leads this Court to conclude that the words 'class-based, invidiously discriminatory animus' refer, at most, to that kind of irrational and odious class discrimination akin to racial bias—such as discrimination based on national origin or religion."

pursuit of his or her endeavors because of the advocacy or practice thereof might easily satisfy *Means*; at least we can think of no principled basis why he or she would not. *A fortiori* the tenants association in the case *sub judice*, which would likely have a more sustained organizational structure than the hypothesized groups above, would qualify. And yet *Griffin* clearly evinces the intention that § 1985(3) *not* become "a general federal tort law," 403 U.S. at 102, 91 S.Ct. 1790. Adopting the *Means* standard would help convert § 1985(3) into precisely such a generalized tort statute.

Rejecting *Means* does not necessarily mean we embrace *McLellan II*'s formulation; we must in turn examine it. We earlier found *McLellan II*'s sense of "class" to be composed of two different notions: (a) those classes which have been specially protected by the various historic and modern civil rights laws (and to us this includes *a fortiori* the "suspect classes" of race, alienage, and the like identified by the Supreme Court under equal protection analysis); and (b) those classes who assert "fundamental" rights.

 We embrace the first of *McLellan*'s two constructs of class, and determine that "invidiously discriminatory class-based animus" in all likelihood includes a conspiracy directed, *inter alia*, against racial, religious, and gender-based classes, classes of aliens, undoubtedly some, if not all, ethnic classes, as well as recent additions such as the class of aged persons (protected by ADEA, 29 U.S.C. § 621 *et seq.*)[8] We do not intend the foregoing to be an exhaustive or precise catalogue, for there may well be other recent federal legislative protections which can properly be held to define a *Griffin* class. Nor need we decide that any

particular group above is in fact a proper class. As it was for the court in *McLellan II*, it is sufficient here for us to identify the approximate description of those classes which have been legislatively and judicially determined to be especially vulnerable to discrimination by society at large and therefore in especial need of protection. It is abundantly clear to us that no matter which classes are included under this construct, a tenants association or a group of persons advocating tenants rights at a private apartment complex is not a recognized class in this sense.

The truly troublesome issue is whether to also follow *McLellan II* by including the class of those who assert "fundamental rights," and if so, whether the Carchmans' rights are capable of being characterized in such "fundamental" terms. Pursuit of this approach requires we first identify those rights characterized as "fundamental." *McLellan II* unfortunately elided from the discussion of suspect classes (*i. e.* race, religion *et alia*) to "fundamental rights" without explaining the transition:

> Being closely allied with fundamental rights, civil rights are open-ended in character . . . the Supreme Court lately has more than once expanded that class of those rights we consider fundamental.

545 F.2d at 932. As examples of "fundamental" rights, *McLellan II* cited *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). These citations create further ambiguity: *Griswold* rested on the Ninth Amendment, and on a First Amendment right of association

8. Limiting the class-based animus in this manner gives 1985(3) a meaningful, complementary role in relation to other civil rights act. It would not be duplicative of existing laws. For example, while the "class-based animus" requirement would, by and large, protect the same classes protected by Title VII, the interests protected are arguably broader because they relate to conditions other than employment; similarly, 1985(3) would have no exhaustion of administrative remedies hurdle.

On the other hand, 1985(3) would be more restrictive than Title VII both because it requires a "conspiracy" and because the requirement of proof of "class-based *animus*" would seem to require more than the mens rea requirement of Title VII. In short, it would protect groups who have historically been determined by Congress and the courts to need special protections in a manner different from companion civil rights laws.

and a Fourth Amendment right of privacy "incorporated" into the Fourteenth Amendment due process clause and hence applicable to the states; *Roe* rested directly on the "liberty" assurance of the Fourteenth Amendment due process clause, rather than on any "incorporated" right; and *Graham* involved, not the due process, but the equal protection clause, and specifically that prong of the "new equal protection" that protects "fundamental" interests. *See* Gunther, "A Model for a Newer Equal Protection," 86 Harvard L.Rev. 1, 8–9 (1972). Citation to these three cases suggest that the *McLellan II* court would include in "fundamental rights" for defining *Griffin* classes: (a) all bill of rights guarantees incorporated into the Fourteenth Amendment; (b) those "liberty" and "property" interests considered "fundamental" for Fourteenth Amendment due process adjudication, *see* Tribe, "Toward a Model of Roles in the Due Process of Life and Law" 87 Harvard 1, (1973); and (c) those "fundamental interests" requiring "strict scrutiny" when examined under the equal protection clause. Apparently, infringement of any of these rights amounts to "class-based invidiously discriminatory animus" for the *McLellan II* court.[9] Under this analysis the Carchmans' asserted rights to free speech and association in the tenants organization would certainly be "fundamental," for as stated, *e. g.* in *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 34 L.Ed.2d 626, 638 "free speech . . . has come to [be] regard[ed] as fundamental and . . . demand[s] the lofty requirement of a compelling governmental interest before [it] may be significantly regulated." In sum, fidelity to *McLellan II* would compel the conclusion that the Carchmans, having asserted the fundamental rights of free speech and association, have pleaded a class against which a "class-based animus" within the meaning of *Griffin* can be directed.[10]

**9.** In contrast, the court in *Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025 (E.D.Va.1973) *aff'd* 508 F.2d 504 (4th Cir. 1974), limited the "fundamental interests" solely to those protected by strict scrutiny under the Equal Protection Clause. *Id.* at 1028.

A theoretical possibility not suggested by either *McLellan II* or *Bellamy* would be to include rights protected by the Privileges and Immunities Clause of Art. IV § 2 of the Constitution, and/or the similar clause of the Fourteenth Amendment. *See* cases analyzed in *Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978). *See also Hicklin v. Orbeck,* —— U.S. ——, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978).

**10.** Our opinion accepts at face value, as it must on a 12(b)(6) motion, the Carchmans' assertion of rights of speech and association and their assertion that defendant is responsible for infringement of those rights. If this case were to have proceeded to trial, it might indeed appear (1) that the Carchmans are in fact not asserting a "fundamental" first amendment right, but rather a non-fundamental non-first amendment right; and (2) that even if they are asserting a first amendment right, defendant cannot be logically said to be responsible for its deprivation. Apparently what happened is that Philip Carchman was an active, vocal member of the tenant association at his private apartment complex. His apartment lease was not renewed, he feels, because of this outspokenness. But, so phrased, is this an allegation that any "fundamental" first amendment right has been denied him? If Carchman is really asserting

that he has a right to have his lease renewed, then he is alleging a violation, not of any first amendment right of speech and association, but of a right to an apartment lease renewal, which was held *not* to be fundamental by the Supreme Court in *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (denying "strict scrutiny" by holding "Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions").

If, in the alternative, he is asserting a right to belong to the Meadowbrook Valley Tenants Association—which *would* implicate the first amendment rights of free speech and association—it is not clear why he must cease belonging to that organization. If the reason is that the by-laws of the tenant group require members to be residents of the apartment complex, then his real complaint is with the tenant association by-laws, not with the defendant. In contrast, if the by-laws permit Carchman to continue to be a member of the group after he moves, can it be said he is being deprived of any speech or associational rights simply because he would have to commute to participate in tenant association activities?

Another theoretical possibility is that Carchman believes defendant has *pursued* him to his new apartment, wherever it may be (if indeed he is a tenant elsewhere) and is intent on denying him his right to belong to *any* tenant organization, no matter which apartment or what landlord is involved. This is the only possibili-

We are persuaded, however, that the rights of speech and association, despite their legal fundamentality, may *not* be used to define *Griffin* classes for two reasons. First, permitting a *Griffin* "class" to be defined by those who exercise rights of speech or association would be in effect no limitation on the definition of a § 1985(3) class whatever. It would permit a virtually open-ended and limitless collection of groups to claim they were proper *Griffin* "classes." The disco dancers, vegetarians, *et alia* who we hypothesized would qualify under the *Means* standard, pp. 735–736 *supra,* would also qualify under a "speech" or "association" related definition of "class-based animus," for any conspiracy aimed at a plaintiff as a *member* of any such organization (as it would have to be in order to satisfy the class-based mens rea requirement) would inevitably be interfering with that member's right to speak for the group and to associate with the group. Yet, *Griffin* clearly intended its "class" requirement to serve a limiting function. We believe that it would be improper to adopt as a method for constructing a "class" one that converts virtually every aggregation into

such a "class." Therefore, the *Griffin* stricture inveighing against turning § 1985(3) into a "general federal tort law," which we earlier read as compelling our rejection of the *Means* "intellectual nexus" test, also compels our rejection of "classes" defined solely on the basis that the members of the groups assert rights of speech and association.

Secondly, defining a *Griffin* class solely on the basis that it consists of persons whose First Amendment rights have been infringed leads to analytical problems. Under *Griffin* the "class-based animus" requirement is clearly separate and independent from the issues of which rights are protected under § 1985(3) and whether Congress has the Constitutional power to compensate the victims of private conspiracies which violate rights protected by the bill of rights. (*See* n.3 *supra*) In other words, under *Griffin,* the "class" criterion is an analytic construct different from the constructs employed to determine the identity of the federal rights intended to be protected and the constitutional scope of Congress' power to protect those rights under § 1985(3).[11] If we define *Griffin* "classes"

---

ty whereby defendant can clearly be said to be denying Carchman his first amendment right to association in a tenant organization. This last possibility does not seem realistic in this case, but the point is that choosing among the possibilities would be inappropriate on a 12(b)(6) motion to dismiss. We have construed the complaint in the light most favorable to Carchman, resolving ambiguities in his favor, and have therefore assumed that first amendment rights are actually involved, and that defendant can logically be said to be the infringer of those rights.

In a somewhat related issue, we note that plaintiffs have alleged injury by virtue of only one act: the refusal of defendants to renew their lease. (¶ 15 amended complaint). Defendants have cited several cases which would apparently support dismissal of the instant complaint on the grounds that refusal to renew the lease was a "spontaneous" act, rather than part of a "general pattern of discriminatory action directed to any class." *Hughes v. Ranger Fuel Corp.,* 467 F.2d 6 (4th Cir. 1972). In *Hughes,* plaintiffs, from a public highway, had been photographing defendants' coal operations to prove violation of federal anti-pollution laws. Coal company employees allegedly attacked them and beat them up. The 4th Circuit, in reviewing a 12(b)(6) dismissal, found

that the "action of defendants was directed at the plaintiffs as individuals because they were engaged in attempting to photograph them (the defendants) and their activities on that particular occasion, not because of any animus against them as members of some class . . . ." *Id.* at 10. In the case at bar, a similar conclusion might be reached, but, as we see it, only as a fuller factual record. Thus, we are puzzled as to how, in the context of a motion to dismiss, the Fourth Circuit could conclusively label the action in *Hughes* insufficient as a matter of law. Since 1985(3) requires a conspiracy, and hence an overt act, the assault and battery could plausibly be construed as that overt act in furtherance of the conspiracy. We think a distinction between a "spontaneous" act and "an act in furtherance of a conspiracy" best awaits proof at trial, or at the least a summary judgment motion, and that it is inappropriate to conclude that a particular act is *not* a manifestation of a conspiracy on a motion to dismiss.

11. In *Griffin,* the construct of race was used to define the "class" of those protected, and the rights of interstate travel and to be free from the badges and indicias of slavery formed the constructs for analyzing Congressional power. Hence, in *Griffin,* the analysis of class and the

in terms of First Amendment rights, we must first decide whether First Amendment rights can be protected, via § 1985(3), from a wholly private conspiracy; that is far from a simple task. *See* n.3 *supra.* If they cannot, then how can litigants possess a "fundamental right" to speech or association sufficient to constitute a *Griffin* "class" ?

The problem thus with the above mode of analysis is that the "class" requirement is subsumed within the rights protected requirement. We are forced to tie the definition of "class" inextricably to the question of Congressional intent and power in enacting § 1985(3), and prevented from analyzing the two issues separately, as *Griffin* requires. This consequence further impels us to reject the position that persons asserting First Amendment rights of free speech and association constitute a class against which "class based animus" within the meaning of *Griffin* can be directed. To that extent we decline to embrace the "fundamental interest" facet of *McLellan II*'s definition of *Griffin* classes. We need not, however, reach the question whether the two infirmities we have identified as inhering in the use of the rights of speech and association to define *Griffin* "classes" would similarly inhere in the use of any other "fundamental" rights and interests when used to identify *Griffin* classes. In other words, we intimate no view as to the propriety of employing other "fundamental" rights or interests to define *Griffin* classes.[12]

For the foregoing reasons, defendant's motion to dismiss the complaint must be granted.

analysis of Congressional power were wholly separate and independent.

**12.** Neither do we rule out the possibility that there may also be federal legislation expressly protecting the First Amendment rights of certain groups which might be sufficiently focused and narrowly enough drawn to create a proper *Griffin* class.