MASSACHUSETTS COUNCIL OF CONSTRUCTION EMPLOYERS, INCORPORATED, & others[1] vs. MAYOR OF BOSTON & others.[2]

Suffolk.  May 6, 1981. — August 28, 1981.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law*, Privileges and immunities, Commerce clause, Federal preemption.  *Labor*, National Labor Relations Act.

Neither the provisions of G. L. c. 149, § 26, giving preference to residents of the Commonwealth for positions in State-funded construction projects, nor an executive order of the mayor of Boston requiring that 50 % of the positions on city-funded construction projects be filled with Boston residents constituted an interference in labor negotiations in violation of the National Labor Relations Act.  [472-473]

General Laws c. 149, § 26, which mandates that private contractors on State-funded construction projects give preference to residents of the Commonwealth in hiring for certain positions, violates the privileges and immunities clause of the United States Constitution.  [474-478]

An executive order of the mayor of Boston requiring that 50 % of the positions on city-funded construction projects be filled with Boston residents violates the commerce clause of the United States Constitution.  [478-480]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 20, 1980.

The case was reported by *Liacos*, J.

*Paul J. Kingston* for the plaintiffs.

---

[1] The other plaintiffs are the Massachusetts State Building and Construction Trades Council, AFL-CIO; the Building and Construction Trades Council of the Metropolitan District, AFL-CIO; individual contractors incorporated in Massachusetts; contractors incorporated in Rhode Island; and members of sixteen trade unions.

[2] The city of Boston, the Boston Redevelopment Authority, the Economic Development and Industrial Corporation, and the Department of Labor and Industries.  The Boston Jobs Coalition, Inc., was allowed to intervene as a defendant.

*Gerard J. Clark* for the Mayor of Boston & others.

*E. Michael Sloman,* Assistant Attorney General (*Carl Valvo,* Assistant Attorney General, with him) for Department of Labor & Industries.

*Kurt M. Pressman* for Boston Jobs Coalition, Inc., intervener.

*Wayne S. Henderson,* for New England Legal Foundation, amicus curiae, submitted a brief.

LYNCH, J.   Before us is a challenge to a portion of G. L. c. 149, § 26,[3] and to an executive order[4] of the mayor of the city of Boston, as well as to a regulation of the Boston Rede-

---

[3] General Laws c. 149, § 26, as amended through St. 1967, c. 296, §§ 2, 3, reads in pertinent part: "In the employment of mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works by the commonwealth, or by a county, town or district, or by persons contracting or subcontracting for such works, preference shall first be given to citizens of the commonwealth who have been residents of the commonwealth for at least six months at the commencement of their employment who are male veterans as defined in clause Forty-third of section seven of chapter four, and who are qualified to perform the work to which the employment relates; and secondly, to citizens of the commonwealth generally who have been residents of the commonwealth for at least six months at the commencement of their employment, and if they cannot be obtained in sufficient numbers, then to citizens of the United States, and every contract for such work shall contain a provision to this effect. Each county, town or district in the construction of public works, or persons contracting or sub-contracting for such works, shall give preference to veterans and citizens who are residents of such county, town or district."

[4] The relevant portion of the mayor's order is as follows:

"(1) On any construction project funded in whole or in part by City funds, or funds which, in accordance with a federal grant or otherwise, the City expends or administers, and to which the City is a signatory to the construction contract, the worker hours on a craft-by-craft basis shall be performed, in accordance with the contract documents established herewith, as follows:

"a. at least 50% by bona fide Boston residents;

"b. at least 25% by minorities;

"c. at least 10% by women.

"For purposes of this paragraph worker hours shall include work performed by persons filling apprenticeship and on-the-job training positions.

"(2) Each department of the City of Boston contracting with any private corporation or person for such construction projects, shall include in all such contracts the provisions of the City of Boston Supplemental

468                                          384 Mass. 466

Massachusetts Council of Construction Employers, Inc. *v.* Mayor of Boston.

velopment Authority (BRA).[5]  The contested section of the statute mandates that private contractors on State-funded construction projects give preference to residents of the Commonwealth in hiring for certain positions.[6]  Disputed in the mayoral order is the requirement that private contractors fill fifty percent of the positions on city-funded[7] construction projects with Boston residents.[8]  Originally the action came before a single justice of this court on a complaint of injunctive and declaratory relief.  The single jus-

Minority Participation and Residents Preference Section to insure compliance with this Executive Order.

"(3) The Equal Employment Opportunity Contract Compliance Office of the City of Boston through the awarding Authority shall be responsible for monitoring and enforcing the provisions of this Executive Order and the contract provisions established in accordance therewith."

[5] Section 8 of the Rules and Regulations of the Boston Redevelopment Authority Governing Chapter 121A Projects in the City of Boston reads as follows:  "The applicant shall state that the 121A entity or any contractor working for the 121A entity will, to the best of its ability grant preference in hiring to Boston residents during the construction period and during the period of management of the Project.  To the extent possible employers under contract to (including subcontractors), or leasing from, the 121A entity will be required to list all job openings with the City of Boston CETA office, ten (10) working days in advance of any public advertisement of the positions.  Any employer under 121A, who utilizes the State Division of Employment Security to find job applicants, will be required to specify in this request a preference for City of Boston residents.  This requirement shall be consistent with all applicable collective bargaining requirements."

[6] There is no challenge to the durational aspect of the residency preference, although the question of the validity of such statutory requirements has been raised in a number of contexts.  Compare *Memorial Hosp.* v. *Maricopa County,* 415 U.S. 250 (1974), and *Shapiro* v. *Thompson,* 394 U.S. 618 (1969), with *Sosna* v. *Iowa,* 419 U.S. 393 (1975), and *Starns* v. *Malkerson,* 326 F. Supp. 234 (D. Minn. 1970), aff'd, 401 U.S. 985 (1971).

[7] The funds involved include significant sums applied by the Commonwealth and the Federal government.

[8] No challenge has been made to those aspects of the order setting out hiring guidelines based on race and sex.  Such provisions in other cities have been the subject of litigation.  See, e.g., *Local Union No. 35, IBEW* v. *Hartford,* 625 F.2d 416 (2d Cir. 1980), cert. denied, 453 U.S. 913 (1981).

tice reserved and reported ten questions to the full court.[9]

A number of issues are raised. Both the statute and the executive order are challenged in their entirety as an inter-

[9] The following questions were reported by the single justice:

"1. Is the application of G. L. c. 149, § 26, to construction projects involving Federal assistance invalid because it is in conflict with the Federal statutes (and rules and regulations derived therefrom) authorizing such assistance and/or is such application of the statute invalid under the Supremacy Clause of the United States Constitution?

"2. Does G. L. c. 149, § 26, conflict with the privileges and immunities clause, the due process clause, the equal protection clause, the contract clause and the commerce clause of the United States Constitution, and does it conflict with Articles I, X, and XII of the Massachusetts Constitution?

"3. Does G. L. c. 149, § 26, conflict with the obligations of the plaintiffs under the National Labor Relations Act, and is it therefore invalid under the Supremacy Clause of the United States Constitution?

"4. Is the application of the residency aspects of Executive Order to construction projects involving Federal assistance invalid because in conflict with the federal statutes (and rules and regulations derived therefrom) authorizing such assistance and/or is such application of the Executive Order invalid under the Supremacy Clause of the United States Constitution?

"5. Does the Executive Order, by establishing a residents' preference, conflict with the privileges and immunities clause, the due process clause, the equal protection clause, the contract clause and the commerce clause of the United States Constitution, and does it conflict with Article I, Article [X] and Article XII of the Massachusetts Constitution?

"6. Do the residency aspects of Executive Order conflict with the obligation of the plaintiffs under the National Labor Relations Act, and is it therefore invalid under the Supremacy Clause of the United States Constitution?

"7. Are the residency aspects of Executive Order invalid under Section 6 or Section 7(5) of Article 89 of the amendments to the Constitution of Massachusetts, and/or G. L. c. 43B, § 13 (the Home Rule Procedures Act)?

"8. Does the BRA violate the provisions of G. L. c. 121A by conditioning approval of application for tax status under that Chapter upon an applicant's acceptance of Section 8 of the BRA's 'Rules and Regulations Governing Chapter 121A Projects in the City of Boston'?

"9. Are the residency aspects of the Executive Order invalid as beyond the inherent power of the Mayor under the City Charter?

"10. Is the conditioning of a developer's application for a UDAG [Urban Development Action Grant] upon his agreement to abide by the residency aspects of the Executive Order in conflict with 42 U.S.C. sec. 5301 *et seq.* and/or is such conditioning invalid under the Supremacy Clause of the U.S. Constitution?"

ference in labor negotiations in violation of the National Labor Relations Act (NLRA), and thereby in conflict with the supremacy clause of the United States Constitution, art. VI, cl. 2. Both are also said to be invalid because of the Federal constitutional protections contained in the privileges and immunities (art. IV, § 2, cl. 1), due process, contract, and commerce clauses. Analogous provisions in the Constitution of the Commonwealth are also invoked by the plaintiffs, chiefly arts. 1, 10, and 12. The executive order alone is claimed to be an improper exercise of power under the "home rule" provisions of art. 2, as amended by art. 89, of the Amendments to the Massachusetts Constitution, and as beyond the inherent power of the mayor under the city charter. So too the actions of the BRA are claimed to exceed the authority granted by G. L. c. 121A. Finally both G. L. c. 149, § 26, and the executive order are challenged in part as they apply to Federal funds. The plaintiffs contend that the Federal statutory and regulatory frameworks for the distribution of these funds forbid the imposition of residency provisions.

We must first consider those statutory arguments which would invalidate the challenged provisions. It is only if the statute and order survive this scrutiny that we need consider constitutional issues. Compare *School Comm. of Springfield* v. *Board of Educ.*, 366 Mass. 315, 338 (1974) (Quirico, J., concurring), cert. denied, 421 U.S. 947 (1975), with *id.* at 339-350 (Tauro, C.J., addendum). In the questions before us, only affirmative answers to the questions concerning preemption under the NLRA (questions 3 and 6) would fully resolve the plaintiffs' claims without reaching a constitutional issue. Since we find for the defendants on that issue, we turn to the privileges and immunities clause of art. IV, § 2,[10] and the commerce clause[11] of the United States Constitution,

---

[10] Article IV, § 2, cl. 1, of the United States Constitution reads as follows: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

[11] Article I, § 8, cl. 3, of the United States Constitution, the commerce clause, reads: "The Congress shall have Power . . . To regulate Com-

384 Mass. 466                                                    471

Massachusetts Council of Construction Employers, Inc. v. Mayor of Boston.

which dictate a decision in the plaintiffs' favor.[12] Finally, we decline to answer question 8, which concerns the residents preference instituted by the BRA, both because we believe the agency may wish to reconsider its regulation in light of this opinion and because the issue has not been adequately argued before this court.

I. THE CHARACTER OF THE RESIDENTS PREFERENCES.

General Laws c. 149, § 26, provides an absolute preference for residents[13] of the Commonwealth in the positions described. There seems little dispute that a qualified resident of the Commonwealth, if available, must be hired for any job covered by § 26. Although the statute also contains a local preference, the Department of Labor and Industries has chosen not to enforce that provision because of concerns about its constitutionality.[14] The order of the mayor is somewhat broader in its application to all "worker hours on a craft-by-craft basis," but rather than imposing an absolute preference it mandates that fifty percent of those hours must be contributed by workers who are residents of the city.

To the extent that all workers are hired anew by contractors for every project, these provisions may have little impact on the structure of the industry or its functioning in interstate commerce. In differing degrees many subcontractors do hire for each project. Frequently, however, a contractor will have a regular work crew, particularly in certain specialized fields. If some members of a crew are

---

merce with foreign Nations, and among the several States, and with the Indian Tribes."

[12] Conceivably, questions concerning the mayoral order could be disposed of on other grounds, but the resolution we reach is intimately related to the questions necessarily discussed in considering G. L. c. 149, § 26.

[13] For purposes of analysis under the privileges and immunities clause, "residents" and "State citizens" are essentially interchangeable terms. See *Hicklin* v. *Orbeck*, 437 U.S. 518, 524 n.8 (1978).

[14] There are a number of other provisions contained in the challenged statute. We consider them to be separable from the residents preference portion of G. L. c. 149, § 26.

not residents of the Commonwealth or of the city, it will be necessary that they be replaced or, alternatively, their employer may opt out of bidding on these projects. The defendants acknowledge that both results do occur.

The goals of both G. L. c. 149, § 26, and the executive order are to lessen unemployment in the Commonwealth or in the city and to ensure that the expenditure of local funds results in maximum benefits to the locality where the monies are raised. As an additional reason for the mayor's order the city describes a desire to ensure adequate representation of city residents in construction union jobs and a lessening of racial tensions.[15]

II. PREEMPTION AND THE NATIONAL LABOR RELATIONS ACT.

The plaintiffs suggest that the policy of the National Labor Relations Act (29 U.S.C. §§ 151 et seq. [1976]) preempts the residents preference contained in both the statute and executive order. In effect G. L. c. 149, § 26, and the order are claimed to be invalid as attempts to override or control substantive terms in agreements between unions and contractors. Neither the Commonwealth nor any of its subdivisions may act in a manner that frustrates Federal labor policy. States are forbidden to penalize practices which Congress and the National Labor Relations Board (NLRB) deem to be legitimate economic weapons. *Lodge 76, Int'l Ass'n of Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976) (State may not penalize union refusal to work overtime when such refusal was allowed under the NLRA); *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236 (1959) (State may not penalize picketing arguably protected under the NLRA even though the NLRB declines jurisdiction), nor may State law be used to dictate the outcome in an area of mandatory bargaining, *Local 24,*

---

[15] The city states that if this action came to trial, evidence would be presented to demonstrate that some members of Boston's nonminority population resented attempts to ensure certain minimal levels of minority and female employment on construction projects. The fifty percent quota was thus established in part to ensure that all segments of the city's population received some of the jobs, thereby alleviating any hostility.

*Int'l Bhd. of Teamsters* v. *Oliver*, 358 U.S. 283 (1959) (State antitrust laws may not be used to invalidate an agreement meant to protect negotiated wage scale).

Here, however, it is difficult to imagine how the Commonwealth or the city is intruding into the negotiating process between contractors and unions. In essence, the plaintiffs argue that the Commonwealth may do nothing that influences any possible condition of a labor contract. This is far too broad a reading of preemption under the NLRA. See *Amalgamated Transit Union, Div. 819* v. *Byrne*, 568 F.2d 1025 (3d Cir. 1977) (en banc) (State did not violate NLRA by threatening to withdraw subsidies to private transportation companies which included unlimited cost of living increase provisions in their collective bargaining agreements). Additionally, in this particular instance, it is curious to contend that the negotiating process has been skewed in favor of either party when both unions and contractors are before this court opposing the residents preference. We therefore answer both parts of questions 3 and 6 in the negative.

III. The Constitutional Provisions at Issue.

The privileges and immunities and commerce clauses act together to provide a free flow of individuals and business activities among the States. The former "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy," *Toomer* v. *Witsell*, 334 U.S. 385, 395 (1948), while the latter serves as an embodiment of the assumption implicit in the Constitution that "the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (Cardozo, J.).

Thus, while States are not prevented from favoring their citizens in certain circumstances, *Reeves, Inc.* v. *Stake*, 447 U.S. 429 (1980) (State may favor its own citizens in selling cement from State-owned plant during shortage); *Baldwin* v. *Fish & Game Comm'n*, 436 U.S. 371 (1978) (States may charge nonresidents substantially higher fees for recreational hunting licenses), there are definite limita-

tions on the methods that may be used, *Philadelphia* v. *New Jersey,* 437 U.S. 617, 627 (1978), and cases cited.

### IV. THE STATUTE.

Determining whether G. L. c. 149, § 26, violates the privileges and immunities clause requires a two-step analysis. First, is the right at stake "fundamental"? See *Baldwin* v. *Fish & Game Comm'n,* 436 U.S. 371, 387 (1978). Compare *Ostrager* v. *State Bd. of Control,* 99 Cal. App. 3d 1, 5 (1979) (participation in State compensation program for victims of crime not fundamental), with *State* v. *Nolfi,* 141 N.J. Super. 528, 537-538 (1976) (out-of-State resident must be allowed to participate in pretrial diversion program for criminal defendants). Second, if the right is found to be fundamental, the discrimination challenged may be justified if there is a showing that nonresidents are a "peculiar source" of an "evil" that the Legislature is seeking to remedy, *Hicklin* v. *Orbeck,* 437 U.S. 518, 525 (1978), quoting from *Toomer* v. *Witsell, supra* at 398, or that there is a valid justification for the distinction other than the mere fact of nonresidency, *Hicklin, supra.* See, e.g., *Rubin* v. *Glaser,* 83 N.J. 299, 305-306 (1980) (State may treat residents and nonresidents differently for some tax purposes, if such treatment bears a close relation to extra taxes paid by residents in other contexts). Accord, *Lung* v. *O'Chesky,* 94 N.M. 802, 804 (1980).

A. *Fundamentality.*

Initially the defendants contend that the employment at issue involves no fundamental interest and so the privileges and immunities clause is inapplicable. A certain surface plausibility is lent to this theory because the term "fundamental" has been used to describe several very different concepts in constitutional analysis. *Carchman* v. *Korman Corp.,* 456 F. Supp. 730, 738 & n.9 (E.D. Pa. 1978). Note, Of Interests Fundamental and Compelling: The Emerging Constitutional Balance, 57 B.U. L. Rev. 462 (1977). Our attention is directed to cases that hold certain rights fundamental for purposes of the equal protection clause of the Fourteenth Amendment to the United States Constitution,

rights which, therefore, can be restricted only upon the showing of a compelling State interest. See, e.g., *Shapiro* v. *Thompson*, 394 U.S. 618 (1969) (right to interstate travel); L. Tribe, American Constitutional Law § 16-10 (1978) (discussing fundamental nature of equal access to the ballot). Admittedly, employment opportunities, whether public or private, have not been given this extraordinarily high level of protection.

For purposes of art. IV, § 2, however, from the earliest incorporation of the notion of "fundamentality," the clause has been thought to protect the "right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise," *Corfield* v. *Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, Circuit Justice). This position has been consistently followed. See *Doe* v. *Bolton*, 410 U.S. 179, 200 (1973); *Ward* v. *Maryland*, 79 U.S. (12 Wall.) 418, 430 (1870). Indeed, reconciling the holding in *Baldwin, supra*, which allowed a substantially higher licensing fee to be charged to out-of-State hunters, with the holding in *Toomer* v. *Witsell, supra*, which negated a substantial differential in license fees for commercial shrimp fishing, is possible because the Court in *Baldwin, supra*, recognized a constitutional difference between recreational activity and the pursuit of a livelihood.[16] See Note, The Privileges and Immunities Clause: A Reaffirmation of Fundamental Rights, 33 U. Miami L. Rev. 691, 693 (1979). Limiting a particular kind of work opportunity because of a person's place of residence does impinge upon a "fundamental" right and thus satisfies the first element of a privileges and immunities analysis.

B. *Possible Sources of Justification for the Discrimination.*

*Hicklin* v. *Orbeck*, 437 U.S. 518 (1978), is controlling on this issue because it establishes a clear rule that a State may

---

[16] The degree to which "learned professions" may present a different situation is not now before us and we express no opinion on that point except to note that the issue is one on which there is substantial debate. See generally Note, A Constitutional Analysis of State Bar Residency Requirements Under the Interstate Privileges and Immunities Clause of Article IV, 92 Harv. L. Rev. 1461 (1979).

not use its control over a resource to create an absolute employment preference for its own residents. There, Alaska had attempted to utilize its control over oil leases on State-owned land to require that Alaska residents be given absolute preference in hiring not only in the oil fields, but also in any activity that benefited from the ripple effect of the energy boom. *Id.* at 531. The Supreme Court rejected Alaska's claim that ownership of the land in question gave the same authority that any owner might have to place conditions on the lease or sale of a resource. *Id.* at 528. A significant factor in the Court's holding was that no evidence was presented that nonresidents were a particular source of Alaskan unemployment. *Id.* at 526. Additionally, the statute was suspect because it swept more broadly than necessary to achieve the goal of increased training and employment of Alaska residents, an end better served by a preference aimed at the unemployed or those in training programs.[17] *Id.* at 527-528. Since *Hicklin* forbids the use of State control over a resource to force an absolute preference in hiring by a private contractor, the residents preference provisions of G. L. c. 149, § 26, must fall.

The defendants would distinguish *Hicklin* on two bases. First, that the regulation at issue merely protects the use of a limited resource (jobs), restricting them to State residents and second, by analogy to certain commerce clauses, that as a market participant it may act unfettered by the restrictions of the privileges and immunities clause. See *Reeves, Inc.* v.

---

[17] It is not totally clear how closely a statute must match means and ends once a substantial State interest in discriminatory treatment has been identified. *Austin* v. *New Hampshire*, 420 U.S. 656, 663 (1975), in analyzing art. IV, § 2, cl. 1, as applied to tax matters, describes "a standard of review substantially more rigorous" than that usually applied to State tax distinctions. This has been compared to the intermediate scrutiny apparently applied in cases dealing with illegitimacy and alienage. See Note, A Constitutional Analysis of State Bar Residency Requirements Under the Interstate Privileges and Immunities Clause of Article IV, 92 Harv. L. Rev. 1461, 1479 (1979); Note, The Privileges and Immunities Clause: A Reaffirmation of Fundamental Rights, 33 U. Miami L. Rev. 691, 698-699 (1979). We need not determine the exact standard of review required since we believe *Hicklin* v. *Orbeck*, 437 U.S. 518 (1978), is controlling on these facts.

384 Mass. 466                                                    477

Massachusetts Council of Construction Employers, Inc. *v.* Mayor of Boston.

*Stake,* 447 U.S. 429 (1980); *Hughes* v. *Alexandria Scrap Corp.,* 426 U.S. 794 (1976).

1. *Limited resources.* There may be a suggestion in older cases that when a State-controlled resource is limited, a preference can be given to residents. See *Toomer* v. *Witsell, supra* at 397-398. But there must be some evidence that the services or resources, assuming they involve fundamental rights, are overburdened. *Doe* v. *Bolton,* 410 U.S. 179, 200 (1973). The defendants point to a high level of Statewide unemployment. *Hicklin, supra,* however, clearly rejects such an argument without a clear demonstration that out-of-State residents are a peculiar source of high unemployment. *Id.* at 526. Such a showing is not made on the record before us.

2. *Acting as a market participant.* The defendants' second contention is that a residents preference in hiring for construction financed by public funds is substantially different from a preference based on the fortuitous location of a natural resource within a State's borders. The Commonwealth would thus turn to *Hughes, supra,* and *Reeves, supra,* in determining the extent to which a State, acting as a purchaser of goods and services, is exempt from the restrictions of the privileges and immunities clause.[18]

The Commonwealth is correct that the commerce clause does not prevent a State from preferring resident business in purchasing goods, see *Hughes, supra* at 810, or services, *American Yearbook Co.* v. *Askew,* 339 F. Supp. 719, 723

---

[18] Neither party discussed to any substantial degree several older decisions upholding G. L. c. 149, § 26, and similar statutes against challenges based on the exclusion of aliens from public construction employment. See *Lee* v. *Lynn,* 223 Mass. 109 (1916) (upholding G. L. c. 149, § 26, against a challenge from Massachusetts residents with foreign citizenship); *Crane* v. *New York,* 239 U.S. 195 (1915); *Heim* v. *McCall,* 239 U.S. 175 (1915). The holdings of these cases are at best questionable in light of more recent decisions dealing with constitutional protections for aliens. See generally Note, A Dual Standard for State Discrimination Against Aliens, 92 Harv. L. Rev. 1516 (1979). In any case, *Hicklin, supra* at 531 n.15, indicates that *Heim* and *Crane* have no weight as precedents in construing art. IV, § 2, of the United States Constitution.

(M.D. Fla.) (three-judge court), aff'd mem., 409 U.S. 904 (1972), or in the distribution of State-produced materials in a shortage situation, *Reeves, Inc.* v. *Stake, supra* at 446-447. One major weakness in such an analogy is that in none of the cases cited was the use of the State's market power extended beyond granting an initial contract or a first sale. The commerce clause cases suggest that Alaska might quite properly have preferred its own residents in granting initial leases on its oil land, but *Hicklin, supra,* leaves no question that the extension of this power to favor absolutely all State residents in employment was unacceptable. Therefore, the statute before us cannot stand. See *Salla* v. *County of Monroe,* 48 N.Y.2d 514 (1979) (overturning on privileges and immunities grounds a New York statute nearly identical to G. L. c. 149, § 26, as enforced). We thus respond "Yes" to the first issue raised in question 2. We need not consider the additional issues raised therein, nor need we answer question 1.

## V. The Executive Order.

### A. *Privileges and Immunities.*

The invalidity of the residents preference contained in the statute does not necessarily dictate a similar result with regard to the mayoral order. The plaintiffs contend that the same privileges and immunities analysis should be applied, but neither on its face, nor in fact, can the order be said to aim solely, or chiefly, at out-of-State residents. The preference is for inhabitants of the city, and its "negative" effect is felt in significant part by other citizens of the Commonwealth, as well as by residents of other States. In such circumstances it may be more difficult to find a violation of the privileges and immunities clause because the discrimination adversely affects citizens of the Commonwealth as well.[19] But see *Construction & Gen. Laborers Local 563* v. *St. Paul,* 270 Minn. 427, 431 (1965) (invalidating, partially on privileges and immunities grounds, a city ordinance re-

---

[19] We do not reach the question whether such discrimination is contrary to the Massachusetts Constitution.

384 Mass. 466 479

Massachusetts Council of Construction Employers, Inc. v. Mayor of Boston.

quiring contractors on public building projects to hire only residents of the county in which the city was located).

B. *The Commerce Clause.*

The commerce clause, however, presents a clear obstacle to the city's order. Neither party would, we think, seriously dispute the proposition that an attempt by the city to apply the regulations contained in the order to all private construction would fall to such a challenge. Simple economic protectionism triggers a "virtually *per se* rule of invalidity." *Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978).

The key question is whether the exception for a State (or one can safely say a municipality) as a market participant, discussed *supra*, serves to protect the mayoral order. In addition, we must consider our decisions and those of other courts which have held that in at least certain kinds of direct hiring, a municipality may employ only residents or may give preference to residents. See *Milton* v. *Civil Serv. Comm'n*, 365 Mass. 368 (1974); *McCarthy* v. *Philadelphia Civil Serv. Comm'n*, 424 U.S. 645 (1976); *Wardwell* v. *Board of Educ. of the City School Dist. of Cincinnati*, 529 F.2d 625 (6th Cir. 1976); *Detroit Police Officers Ass'n* v. *Detroit*, 385 Mich. 519 (1971).

We perceive, however, three key distinctions between the actions upheld in the cases cited by the defendants and the mayoral order. First, given the statement of agreed facts, there is no doubt that the implementation of the mayor's order will have a significant impact on those firms which engage in specialized areas of construction and employ permanent works crews composed of out-of-State residents. The municipal hiring cases are quite different since they affect the permanent domicil of employees rather than discouraging the interstate activities of construction firms. Second, the record indicates that a significant percentage of the funds affected by the order are received from Federal sources. Thus, it is inaccurate to describe the preference as a mere use of city-raised funds to further local interest. The analysis in *Reeves, supra,* which the city cites in defense of the executive order, is distinguishable on this ground. There,

the concrete plant operated by South Dakota was an example of State-raised revenues being expended with a genuine risk of failure, the cost of which would have been borne by the State. The Court of Appeals of New York in *Salla, supra* at 524-525, found this element nearly definitive in justifying the invalidation of New York's residents preference in the awarding of public construction contracts. We do not go so far, but the presence or absence of substantial funds from nonlocal sources is at the very least an important factor in determining whether the *Reeves* decision is applicable.

Finally, as in *Hicklin, supra*, there is a broadly drawn statute which sweeps far wider than merely favoring unemployed or underemployed local residents. Although *Reeves, supra*, does indicate that a sympathetic reading under the commerce clause should be given to State or local action in a proprietary capacity, it is doubtful that the city is acting in its proprietary capacity in all the activities affected by the executive order. Even if this were so, the extensive preference for local residents contained in the executive order cannot come within the exception outlined by *Reeves* because it sweeps so broadly. In *Reeves*, the existence of a genuine shortage of concrete necessitated some form of rationing. The State's choice of favoring its own citizens was a rational means of allocation which recognized the special interests of local taxpayers. The executive order before us establishes a strict numerical requirement which is not at all targeted to the legitimate interests which the city has asserted. Given the order's negative impact on interstate commerce linked with this broad application, it must fall. Question 5 is to that extent answered in the affirmative and we therefore need not reach questions 4, 7, 9 and 10.

In summary, we answer questions 3 and 6 "No."

We answer question 2 "Yes" to the extent outlined in part IV.

We answer question 5 "Yes" to the extent outlined in Section V.

We decline to answer questions 1, 4, 7, 8, 9, and 10.